**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jose Reynaldo VILLAMONTE–MAR-
QUEZ and Robert Sortgese Ham-
parian, Defendants-Appellants.**

No. 80–3633.

United States Court of Appeals,
Fifth Circuit.
Unit A

Aug. 3, 1981.

Rehearing and Rehearing En Banc Denied
Oct. 19, 1981.

482

Richard P. Ieyoub, Lake Charles, La., for defendants-appellants.

Franklin W. Dawkins, D. H. Perkins, Jr., Asst. U. S. Attys., Shreveport, La., for plaintiff-appellee.

---

* Senior Judge of the United States Court of Claims, sitting by designation.

Before SKELTON *, Senior Judge, and RUBIN and REAVLEY, Circuit Judges.

SKELTON, Senior Judge.

On March 12, 1980, the defendants, Jose Renaldo Villamonte-Marquez and Robert Sortgese Hamparian, were indicted on four counts involving approximately 5800 pounds of marijuana, a Schedule I Controlled Substance. They were charged in Count I with conspiracy to import marijuana in violation of 21 U.S.C. § 963, in Count II with unlawfully importing marijuana in violation of 21 U.S.C. § 952(a), in Count III with conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846, and in Count IV with unlawful possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The indictment to which both defendants pleaded not guilty, resulted from the search and seizure of the sailboat Henry Morgan II where the marijuana was found. Following a hearing, defendants' motion to suppress the marijuana was denied by the district court. The case went to trial and a jury convicted the defendants on all four counts of the indictment. Each defendant perfected an appeal to this court, the primary thrust of which is directed to the district court's denial of the suppression motion. For the reasons set out below, we reverse.

The facts are as follows. On the evening of March 5, 1980, Customs Patrol Officer Buddy Jack Harrison, stationed in Morgan City, Louisiana, received information from a reliable informant that there were two loads of marijuana on two separate vessels in the Hackberry-Cameron, Louisiana, area waiting for persons to offload the cargo, and that the operators of those vessels spoke a foreign language. The informant could neither describe the vessels nor give their exact locations. This information was given to Senior Customs Patrol Officer Lor-

en Wilkins who, with Customs Patrol Officer Robert Thompson, began a road check of docks and marinas for boats that would not ordinarily be in the area. A water search was also conducted by officers of the Louisiana Department of Wildlife and Fisheries and by customs agents.

About midnight on March 5, or in the early hours of March 6, while on the intracoastal waterway, the officers conducting the water search observed a small aluminum boat, approximately eighteen feet in length, in the water, with no running lights showing, in violation of navigation laws. They noticed three five-gallon fuel cans in the rear of the boat, two of which contained diesel fuel, some new tarpaulins and a walkie-talkie radio. No fishing gear was observed aboard the boat, although the operator, whose driver's license identified him as John Lewis Dexter, stated that he was going to meet some friends below Hackberry to do some fishing. Later the officers observed Dexter travelling back and forth several times over the Ellender Bridge in a vehicle pulling an empty trailer. Dexter then proceeded under the bridge to load the boat, which he had left with the wildlife and customs officers while he went to get his vehicle and trailer. Prior to Dexter's arriving at the boat ramp to pick up his boat, the agents had checked his address as given to the wildlife agents and determined that no one with his name lived at the address given on his driver's license and that none of the cars present in the driveway at that address were registered to him.

Wilkins and other officers resumed their surveillance in a state police water patrol boat in the Calcasieu River Ship Channel,[1] when at approximately 11:00 or 11:35 A.M. on March 6, 1980, they first observed the sailboat Henry Morgan II anchored facing east on the west side of the ship channel. At the time of initial observance the sailboat was approximately 18 miles inland from the coast. As they approached the anchored sailboat, they observed a large freighter vessel moving north in the ship channel toward the Port of Lake Charles,

creating a huge wake that caused the sailboat to rock violently from side to side. The patrol boat approached the sailboat from the port side and passed behind its stern, where the words HENRY MORGAN II and a home port designated as Basilea were observed. At that point, Wilkins did not recognize Basilea as being a home port in the United States. As the officers were passing behind the stern of the sailboat, a man stood up on deck where the officers were able to see him. Agent Wilkins asked in a loud voice if he was all right. The man, later identified as defendant Robert Sortgese Hamparian, merely shrugged his shoulders and lifted his hands. Wilkins then repeated the question louder and got no response. There was a discussion by Wilkins with the officers on the boat, as he felt that the vessel was foreign since the man appeared not to understand English, and the home port was believed to be foreign.

Another individual, later identified as defendant Jose Renaldo Villamonte-Marquez, was seen looking out from the mid-cabin of the boat. Wilkins and Officer Danny Dougherty, a narcotics investigator for the Louisiana State Police, boarded the vessel to check documentation. Defendant Hamparian met the boarding officers and upon Wilkins' request to see the vessel's documentation, handed him a document, which appeared to be a request to change the registration of a ship from Swiss registry to French registry, written in French and dated February 6, 1980.

While talking to defendant Hamparian, Wilkins smelled the odor of burning marijuana and asked Officer Dougherty if he smelled it, too. After receiving Dougherty's affirmative response, Wilkins looked through an open door hatch and observed burlap-wrapped bales in plain view. Officer Wilkins entered the cabin and opened one of the bales, and, based on his prior experience as a customs officer and in law enforcement, he knew the bale contained marijuana. Defendant Villamonte-Marquez was at that time on a sleeping bag on

1. Also referred to as the Lake Charles Ship Channel.

top of the bales. Wilkins then arrested both defendants and gave them the *Miranda* warning in both English and Spanish, and they acknowledged that they understood. A total of approximately 5,800 pounds of marijuana was found in the forward, mid and aft cabins, and under seats in the open part of the vessel.

After the search and the arrests were made, it was discovered that the vessel was almost out of diesel fuel. More fuel had to be obtained prior to moving the sailboat to the dock. In addition, neither of the foreign passports presented to Wilkins by the defendants indicated that they had been admitted to the United States. The marijuana and documents taken from the vessel were placed in the custody of special agent Dick Gustafson of the United States Drug Enforcement Administration.

At the trial, the defendants moved to suppress the marijuana, alleging an unlawful search and seizure of the sailboat and of the marijuana. The motion was denied and the case was tried to a jury. Both defendant Hamparian and defendant Villamonte-Marquez were convicted on all counts and each properly perfected his appeal to this court.

On Appeal, the defendants argue four main points of error which they contend require the reversal of their convictions. First, the district court erred in denying defendants' motion to suppress the marijuana. Second, the district court erred in allowing the nautical map of the Gulf of Mexico into evidence over defendants' objections that no foundation had been laid to establish the map's accuracy and the government had failed to comply with the defense's motion for discovery in relation to the map. Third, the district court abused its discretion in permitting the introduction of a log and an act of sale taken from the Henry Morgan II without requiring the government to lay a proper foundation for authentication of the documents. Lastly, the district court abused its discretion in refusing to permit defendants' expert botanist to impeach the government's expert witness by testifying that there are three species of marijuana.

The primary issue is the constitutionality of the search and seizure of the Henry Morgan II and its cargo. By statute, customs officers have the authority to:

> * * * go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance. 19 U.S.C. § 1581(a).

■ The broad language of the statute, however, is circumscribed by the reasonableness requirement of the Fourth Amendment.[2] *United States v. D'Antignac*, 628 F.2d 428, 432 (5 Cir. 1980); *cert. denied*, 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981); *United States v. Serrano*, 607 F.2d 1145, 1147 (5 Cir. 1979), *cert. denied*, 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980); *United States v. Freeman*, 579 F.2d 942, 945 (5 Cir. 1978).

The constitutionality of the boarding of a vessel in inland waters by customs officers pursuant to 19 U.S.C. § 1581(a) has been the subject of numerous cases in this circuit, e. g., *United States v. Guillen-Linares*, 643 F.2d 1054 (5 Cir. 1981); *United States v. D'Antignac, supra; United States v. Serrano, supra; United States v. Castro*, 596 F.2d 674 (5 Cir. 1979), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1980).

---

**2.** The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The Supreme Court addressed the question of the constitutionality of investigatory stops of vehicles, not near the border by roving patrols of the United States Border Patrol in *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The court concluded that:

> [e]xcept at the border and its functional equivalents officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain illegal aliens or contraband. 422 U.S. at 884, 95 S.Ct. at 2581–82, 45 L.Ed.2d at 618.

Applying the "reasonable suspicion" standard, the court held in that case that the single factor relied on by the officers to justify the stop, namely, the apparent Mexican ancestry of the vehicle's occupants, was not sufficient.

This court has approved boardings of vessels in inland waters by customs officials where the officers had reasonable suspicion of a customs violation. In *United States v. Whitmire*, 595 F.2d 1303 (5 Cir. 1979), *cert. denied*, 448 U.S. 906, 100 S.Ct. 3048, 65 L.Ed.2d 1136 (1980), we upheld the boarding of a docked boat that had been initially sighted travelling in the intracoastal waterway. After first determining that the border search analysis was inapplicable on the facts but that a recent nexus to the border is not a prerequisite for an investigatory stop based on reasonable suspicion, we held that the officers did have a reasonable suspicion of a customs violation after observing that the boat had been riding heavy in the bow and had sped through a "no wake" area in violation of navigation laws, and after an unsatisfactory document check ashore. *Id.*

In *United States v. Castro, supra*, this Court was, for the first time, called upon to address the constitutionality of the search of a vessel which had been initially sighted in inland waters and subsequently searched while still in those waters. In that case, after observing the shrimping vessel Tanila on the intracoastal waterway, and prior to boarding it, the customs agents ran a document check and were informed by the Coast Guard documentation officer that no vessel named Tanila was documented. Thereupon, the officers boarded and searched the vessel. Upholding the legality of the boarding and the search, we held that:

> [a]t the time of the boarding, the customs agents possessed sufficient articulable facts to support an inference that the TANILA was involved in smuggling contraband. Boarding to determine the vessel's identity and documentation was a reasonable response to that suspicion. 596 F.2d at 676.

The boarding and search of the shrimping vessel, the Bonnie Lass, was held to be valid in *United States v. Serrano, supra*, where the vessel had been seen travelling in Tampa Bay at night without the required navigation lights. The court concluded in that case that the applicable standard was that:

> Customs officers may make an investigatory stop of a vessel on inland waters adjacent to the open Gulf of Mexico under 19 U.S.C.A. § 1581(a) on facts which justify a reasonable suspicion of illegal activity. The evidence need not support suspicion of a border crossing, but only of the presence of contraband. See *United States v. Rivera*, 595 F.2d 1095, 1098 n. 4 (5th Cir. 1979) 607 F.2d at 1148.

In *United States v. D'Antignac, supra*, we formulated the *Serrano* rule into a test, holding that:

> the constitutionality of the boarding [of a vessel in inland waters under § 1581(a)] turns * * * on one of the following two principles: 1) a border search; or 2) a limited investigatory stop based upon a reasonable suspicion of law violation. 628 F.2d at 433.

*See, United States v. Guillen-Linares*, 643 F.2d at 1056, and *United States v. Serrano, supra*. In the *D'Antignac* case, we upheld the boarding and search of the M/V Little Hornet, a shrimping vessel, on the basis of the second principle after rejecting the border search concept. The erratic movements of the Little Hornet late at night in the intracoastal waterway, the fact that the

coastal waters were closed to shrimping, and the prior information that the Little Hornet was suspected of being involved in smuggling contraband raised a reasonable suspicion of a law violation.

In the recent case of *United States v. Guillen-Linares, supra,* which involved the boarding and search of the Miss Port Canaveral, we addressed the issue of whether, absent any articulated facts or circumstances which might have aroused in the customs officers a reasonable suspicion of illicit activity, the seizure of the Miss Port Canaveral was reasonable under the fourth amendment. In reversing the district court's denial of the defendants' motion to suppress, we held that the boarding violated the reasonableness requirement of the fourth amendment. *Id.* at 1057.

In the instant case we are only concerned with the constitutionality of the officers' initial boarding of the vessel. The defendants do not contest the existence of probable cause and exigent circumstances to justify a warrantless search of the vessel once the officers had boarded it and smelled marijuana. *See,* e. g., *United States v. Serrano,* 607 F.2d at 1148; *United States v. Kleinschmidt,* 596 F.2d 133, 136 (5 Cir. 1979); *cert. denied,* 444 U.S. 927, 100 S.Ct. 267, 62 L.Ed.2d 184 (1979); *United States v. Freeman,* 579 F.2d at 948.

■ The government contends that the facts support the boarding of the Henry Morgan II as a valid border search, however in its denial of the motion to suppress, the district court upheld the boarding solely on the basis of a reasonable suspicion of a customs violation. For a boarding of a vessel in inland waters to be justified on the basis of a border search, there must be some nexus to the border, some degree of probability that the vessel has crossed the border. *See United States v. Whitmire, supra,* where we held:

> In water cases, the true border is an imaginary line three miles offshore. Though we have not required the coast guard or customs officers to observe the vessel as it crosses this imaginary line, our precedent generally has required that

the officials have articulable facts from which they may reasonably infer that the boat has come from international waters. 595 F.2d at 1307.

This court has rejected the border search analysis in cases where the facts indicating the probability of a border crossing were much stronger than those in the instant case. In *United States v. Whitmire, supra,* we found the border search analysis inapplicable, although the boat was initially sighted within the shoreline in an inlet between the ocean and the intracoastal waterway, the boat was encrusted with salt crystals, and the boat's occupants were wearing brand-new sweatshirts with the word "Bimini" printed across the chest. We again refused to uphold the boarding of a vessel as a valid border search in *United States v. Castro, supra,* where the Tanila was first sighted offshore and later seen by officers on the intracoastal waterway approximately 20 miles from open waters. In upholding the boarding of the vessel Business Stinks on the basis of reasonable suspicion of wrongdoing in *United States ˙v. Kleinschmidt, supra,* the court did not decide whether the vessel, which was sighted approximately one mile offshore, had a sufficient nexus to justify the boarding as a border search.

■ In the instant case, the Henry Morgan II was first sighted approximately 18 miles inland from the coastline, 21 miles from the border. When sighted and boarded the vessel was at anchor with no indication that it had just come from the high seas as was the case in *Whitmire* where the hull of the boat was encrusted with salt crystals. Although the vessel had just entered the United States as evidenced by its log books examined after the boarding, the officers had no reason to believe prior to boarding that this was the case. It is clear on the record before us that at the time of the boarding of the vessel, there was no nexus with the border and, therefore, we conclude that the boarding of the defendants' vessel under § 1581(a) cannot be justified on the basis of a border search.

We now turn to the second basis for the boarding of the vessel in inland waters under § 1581(a), which requires the officers to have a "reasonable suspicion of a law violation." In denying the defendants' motion to suppress, the district court listed five articulable facts which he found gave the officers a reasonable suspicion of a customs violation. One, the information given to officer Harrison by a confidential informant that two boats with foreigners would be in the Hackberry-Cameron, Louisiana, area with marijuana on board waiting to be offloaded. Two, the finding of the aluminum boat in the water at midnight without running lights and with gasoline cans containing diesel fuel. Three, the sighting of the Henry Morgan II in the ship channel where the officers had never before seen a sailing vessel anchored. Four, the name of the home port painted on the stern of the vessel appeared to be a foreign port. Five, the actions of defendant Hamparian in shrugging his shoulders and failing to speak in response to officer Wilkins' questions about possible injuries aboard, which gave the officer reasonable suspicion to believe he was a foreigner.

None of the "articulable facts" cited by the district court even arguably support the required reasonable suspicion of law violation. The government placed great emphasis on the aluminum boat found operating at night without running lights and the activities of the boat's occupant. The only possible nexus between the aluminum boat and the sailboat was the discovery of the cans of diesel fuel on the aluminum boat and the fact that the Henry Morgan II was out of diesel fuel. However, this tenuous nexus is not valid in light of the fact that the officers did not discover that the Henry Morgan II was out of fuel until after the boarding and search had been completed and the defendants had been placed under arrest without first establishing a connection between the two vessels. The activities of the aluminum boat and its occupant do not create any suspicion about the sailboat. Therefore, the suspicious activities of the occupant of the aluminum boat cannot be considered as a factor to justify the boarding when no possible connection was made with the sailboat prior to the boarding.

Another fact relied on by the district court was the confidential tip given by an informant to officer Harrison that there were two boats with foreigners and loaded with marijuana in the Hackberry, Louisiana, area. The tip, apparently based on hearsay, contained no specific information on the type of vessel or the nationality of the alleged smugglers. The officers testified that it was their intent to make a general search of the Hackberry area for any vessels they did not believe normally belonged there. General information of the type supplied by the informant did not give the government agents a roving commission to stop and question the occupants of all boats not recognized as ordinarily present in the area.

The officers also testified that the Henry Morgan II's position, anchored in the ship channel, was an unusual place for a sailboat. At the time it was sighted, the vessel's sails were down and it was facing in a south or southeasterly direction. Officer Wilkins testified that he had seen shrimper-type vessels anchored in the channel before, and that there were sailboats on nearby Calcasieu Lake. Generally, for an unusual location to be "suspicious" requires the presence of other factors that are suspicious in and of themselves, as in *United States v. D'Antignac, supra*, where the fact that shrimping vessels were not normally found in a particular area was accompanied by erratic movements of the vessel, and the fact that the vessel was on the list of suspected smuggling vessels.

The district court also found that the officers' belief that the sailboat's home port "Basilea" painted on the stern was foreign, and that defendant Hamparian was of foreign origin due to his method of replying to officer Wilkins by shrugging his shoulders, supported a "reasonable suspicion" on the part of the officers. In *United States v. Castro, supra*, one important factor giving rise to a reasonable suspicion to justify the boarding was the check with the Coast Guard documentation officer in Washington, D. C. about the vessel which re-

vealed that no vessel named Tanila was documented. In the instant case, however, the officers did nothing prior to the boarding to substantiate their belief that the Henry Morgan II was a foreign vessel or that Basilea was a foreign port. They merely assumed that the ship and port were foreign. Such an assumption on the part of the officers, without some effort by them to determine if it was correct, was not sufficient to support a "reasonable suspicion" that justified the boarding of the vessel. Likewise, defendant Hamparian's shrugging of his shoulders rather than answering the officer orally did not necessarily indicate that he was of foreign origin. The officers merely assumed that he was a foreigner.

Whether reasonable suspicion exists in a particular case depends on the totality of the circumstances. *See United States v. Brignoni-Ponce*, 422 U.S. at 885, n. 10, 95 S.Ct. at 2582, n. 10, 45 L.Ed.2d at 618 (1975); *United States v. Escamilla*, 560 F.2d 1229, 1231 (5 Cir. 1977). However, an officer's hunch or generalized suspicion of criminal activity is not sufficient. *See, Terry v. Ohio*, 392 U.S. 1, 22, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889, 906 (1968); *United States v. Himmelwright*, 551 F.2d 991 (5 Cir.), *cert. denied*, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977). As Mr. Justice Harlan stated in his concurring opinion in *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968):

> There must be something at least in the activities of the person being observed or in his surroundings that affirmatively suggests * * * criminal activity * * *. 392 U.S. at 73, 88 S.Ct. at 1907, 20 L.Ed.2d at 941.

See, *United States v. D'Antignac*, 628 F.2d at 434 (erratic movements of vessel, coastal shrimping out of season, boat on list of suspected smuggling vessels); *United States v. Serrano*, 607 F.2d at 1149 (travelling at night without navigation lights, exchange of lights with another darkened vessel, shrimper vessel stopped in shallow area near residential area); *United States v. Castro*, 596 F.2d at 676 (document check determined that no vessel named Tanila was documented); and *United States v. Whitmire*, 595 F.2d at 1316 (violation of navigation laws, vessel riding heavy in the bow, unsatisfactory document check ashore).

In the case before us, the government can point to nothing which could have affirmatively suggested a possible law violation to the officers. From the "articulable facts" known to the officers at the time of the boarding, a reasonable suspicion of a law violation could not rationally be inferred. The facts could support nothing more than a generalized suspicion and speculation in the minds of the officers. Therefore, the search and seizure of the vessel and its cargo was not reasonable under the fourth amendment. We hold that the court erred in denying defendants' motion to suppress.[3]

The decision of the district court is reversed.

REVERSED.

---

3. Because of our disposition of the fourth amendment issue, we do not reach the other points of error raised by the defendants.