**UNITED STATES of America,
Plaintiff-Appellant,**

v.

**Joseph ALBANO, Jr., et al.,
Defendants-Appellees.**

No. 82–8781.

United States Court of Appeals,
Eleventh Circuit.

Jan. 9, 1984.

Joseph D. Newman, Asst. U.S. Atty., Savannah, Ga., Mervyn Hamburg, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Anthony M. Cardinale, Boston, Mass., for Albano & Deciutiss.

Mark J. Kadish, Atlanta, Ga., for Byrnes, Hare & Rush.

Before HILL and KRAVITCH, Circuit Judges, and MORGAN, Senior Circuit Judge.

JAMES C. HILL, Circuit Judge:

The United States appeals an order by the district court granting defendants' motion to suppress 3,000 pounds of marijuana. For two reasons, we reverse. First, we hold that Customs officers, possessing reasonable

suspicion of illegal activity, lawfully stopped the vessels involved and seized contraband in plain view pursuant to their authority under 19 U.S.C. § 1581(a) and within the limitations prescribed by the fourth amendment. Second, we hold that the Supreme Court's recent decision in *United States v. Villamonte-Marquez,* —— U.S. ——, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983), confirms the lawfulness of the officers' actions even if we were to find that reasonable suspicion was lacking.

## I. FACTS GIVING RISE TO REASONABLE SUSPICION

Customs officials, DEA agents, and other law enforcement officers suspected two vessels anchored in the Crooked River[1] of smuggling contraband. Suspicion had been aroused by a series of observed events following an incomplete and unsubstantiated tip from a private radio "ham" operator in Long Island, New York. Following up on the tip, the officers involved had placed appellants Torsone, Deciutiis, and Byrnes, under surveillance. The officers observed them as they traveled along interstate highways from New York to Fernandina Beach, Florida.

No single act observed was illegal, and none was, in and of itself, sufficient to create reasonable suspicion.[2] However, every act of those under surveillance was consistent with acts known to the officers as actions taken by persons meeting shipments of contraband drugs at the seacoast and introducing such contraband into the country. That is to say, those being observed did those things that drug importers do and they did nothing inconsistent with drug importation, even though they were under surveillance for an extended period of time.

Without detailing all that was observed, we note these events. Torsone and Byrnes rented a Winnebago in upstate New York and Torsone, together with his wife and children, left New York headed south. Two days later, the Winnebago, under surveillance, pulled into Fort Clinch State Park in Fernandina Beach, Florida. There, three unidentified males met near the Winnebago. A second motorhome, a Coachman, bearing a New York license plate, and a Ford pickup truck, also bearing a New York plate and pulling an 18-foot outboard motorboat, parked near the Winnebago at Fort Clinch. People from the two motorhomes met and inspected the boat.

The next day, two unidentified men drove the truck pulling the motorboat to Crooked River State Park in southeastern Georgia. The two men offloaded the boat into Crooked River and spent the remainder of the day traveling in and around the ICW. On the following day, the two motorhomes left Fernandina Beach and rendezvoused with the truck and motorboat at the Georgia Welcome Center on I–95 just inside the Georgia boundary line. Occupants from each of the vehicles again met near the Winnebago. Later, the two motorhomes traveled to Crooked River State Park and parked near cabins 4 and 5. The truck also returned to the area and proceeded toward a boat dock just north of Crooked River State Park.

The officers in charge set up a command post at a bait shop near the sites of the two motorhomes. From the command post, officers noticed a large sailboat anchored in the north fork of the Crooked River in an area near the campsites of the two motorhomes. The name COOL BREEZE and the port of Albany, New York were printed

---

1. The north fork of the Crooked River connects to the Atlantic Ocean by way of the Atlantic Intracoastal Waterway (ICW). The suspect vessels were seized near the ICW about three and one-half miles from the ocean.

2. It is by now axiomatic that Customs officers, acting pursuant to the plenary authority granted them by 19 U.S.C. § 1581(a), may conduct limited "investigatory stops" of vessels in Cus-

toms waters if the officers "are aware of articulable facts which justify a reasonable suspicion of illegal activity" aboard those vessels. *United States v. Gollwitzer,* 697 F.2d 1357, 1359 (11th Cir.1983) (footnote omitted); *United States v. Kent,* 691 F.2d 1376, 1378 (11th Cir. 1982); *United States v. Serrano,* 607 F.2d 1145, 1148 (5th Cir.1979), *cert. denied,* 445 U.S. 965, 100 S.Ct. 1655, 64 L.Ed.2d 241 (1980).

on the boat's stern. Officers manned two boats and set up a surveillance of the COOL BREEZE and the motorboat driven by appellants Deciutiis and Albano. As dusk fell, the motorboat proceeded past the command post in an easterly direction toward the ICW, where the COOL BREEZE was already anchored.

Thus, when the motorboat left the dock late in the day on the Crooked River, the experienced officers, having no probable cause to arrest, were nonetheless reasonably suspicious that a transfer of contraband from the COOL BREEZE to the motorboat would likely take place if, indeed, the motorboat came alongside the COOL BREEZE. It did. However, in the gathering darkness, the officers were unable to discern the nature of the activities taking place aboard the two vessels. Presently, while continuing to watch the suspect vessels, the officers saw what appeared to be a flashing light coming from a bluff near cabins 4 and 5, where the two motorhomes were parked.

■ After allowing time for the commencement of whatever transaction was to be taken to get under way, the officers determined to make their unanticipated presence known, to draw alongside the vessels and to take action appropriate to what was then observed. The officers, displaying their boat's revolving blue lights, then approached the suspect vessels. At that time, the officers' suspicions were as reasonable as were those of the authorities involved in the stopping of the vessel underway in *United States v. Andreu,* 715 F.2d 1497 (11th Cir.1983), even though in *Andreu* observations had been of the vessel at sea, and here they had been of the persons on the land-based end of the transaction.

Therefore, we conclude, as did the *Andreu* court, that there was nothing which violated the fourth amendment in these officers' identifying themselves afloat on open waters near the suspected vessels, by turning on blue lights, and notifying those aboard the vessels who they were. That is to say, law enforcement officers, having developed reasonable suspicion of illegal activity, could then identify themselves by whatever means were appropriate under the circumstances. *See United States v. Gollwitzer,* 697 F.2d 1357, 1360 n. 3 (11th Cir.1983) (while an initial stop which restricts a vessel's freedom to proceed is considered a "seizure," the encounter, if reasonable, is not proscribed by the fourth amendment); *United States v. Williams,* 617 F.2d 1063, 1071 n. 1 (5th Cir.1980) (en banc).

If one may approach and inspect vessels in open waters, there is no constitutional prohibition against identifying by blue lights, markings, or hailings who it is approaching. Indeed, it is advisable lest the innocent mistake those approaching as brigands to be repelled, or the guilty mistake them as unfortunate witnesses to be dispatched. Even identification as law enforcement personnel in this instance did not suffice for protection. When that identification had been made, appellant Deciutiis jumped in the motorboat, drew rapidly away, executed a 180 degree turn, and, returning at high speed, rammed into the officers' boat.

■ Regardless of the propriety, *vel non,* of the first approach, arrest was then based on probable cause. *See United States v. Bailey,* 691 F.2d 1009, 1016–17 (11th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2098, 77 L.Ed.2d 306 (1983). The arrest, followed by the seizure of marijuana in plain view aboard the decks of the vessels and full search of the two boats, in no way violated the fourth amendment. *United States v. Herrera,* 711 F.2d 1546 (11th Cir. 1983) ("there can be no reasonable expectation of privacy concerning the open deck of a vessel subject to a valid investigatory boarding under section 1581(a)"); *United States v. Gollwitzer,* 697 F.2d 1357, 1362 (11th Cir.1983).

■ Therefore, under *United States v. Andreu,* and *United States v. Bailey,* we conclude that the transaction leading to the

arrest of appellants did not violate their constitutional rights.[3]

## II. STOPS UNDER VILLAMONTE–MARQUEZ

Although we conclude that these law enforcement officers conducted a valid section 1581(a) investigation based on reasonable suspicion of illegal activities aboard the two vessels in question, we are fortified in our conclusion by the Supreme Court's recent decision in *Villamonte-Marquez*, —— U.S. ——, 103 S.Ct. 2573, 77 L.Ed.2d 22 (1983). *Villamonte-Marquez*, a decision handed down over a year after the district court entered its order in this case, makes it further and abundantly clear that the officers' actions were in keeping with our constitution.

In *Villamonte-Marquez* Customs officers, accompanied by state policemen, were patrolling a large waterway which connected to the Gulf of Mexico in search of two vessels which, the officers were informed, carried marijuana from the Gulf into Louisiana ports. 652 F.2d 481, 482 (5th Cir. 1981). According to their information, the officers would observe that the operators of the smuggling boats spoke a foreign language. When they observed a 40-foot sailboat rocking rather violently in the wake of a freighter, the officers approached the sailboat and twice asked the crewmen whether they were all right. The crewmember on deck simply shrugged his shoulders each time. Thus, the crewmember's unresponsiveness to questioning about his safety led the officers to suspect that the sailboat might be one of the smuggling vessels. *Id.* at 482–83. The officer then boarded the sailboat and asked to see its documentation. While on board, the officers smelled burning marijuana and observed burlap-wrapped bags that turned out to be marijuana. On these facts, the Fifth Circuit Court of Appeals held that the officers

lacked reasonable suspicion of illegal activity aboard the sailboat; therefore, the section 1581(a) boarding was carried out in violation of the fourth amendment. *Id.* at 488.

The Supreme Court disagreed with the Fifth Circuit's restrictive interpretation of section 1581(a) and reversed. After considering the similarities between cases involving Customs "stops" and those involving stops by land-based officials such as Border Patrol officers, the *Villamonte-Marquez* Court reasoned:

> It seems clear that if the Customs officers in this case had stopped an automobile on a public highway near the border, rather than a vessel in a ship channel, the stop would have run afoul of the Fourth Amendment because of the absence of articulable suspicion .... But under the overreaching principle of "reasonableness" embodied in the Fourth Amendment, we think that the important factual differences between vessels located in waters offering ready access to the open sea and automobiles on principal thoroughfares in the border area are sufficient to require a different result here.

103 S.Ct. at 2579–80 (citation omitted). Those "factual differences" included the impracticability of permanent check-points on open waters, the absence of legally required license plates and other markings for waterborne vessels, and the greater complexity of statutes and regulations governing maritime documentation. *Id.* at 2580–81. In light of the vital public interest in allowing Customs officers to check a seafaring vessel's documentation and in light of the fact that such inspections "involve[] only a brief detention where officials come on board, visit public areas of the vessel, and inspect documents ...," the Court concluded that these modest intrusions do not violate fourth amendment "reasonableness" requirements. *Id.* at 2581–82.

---

**3.** Our conclusion that the turning on of blue lights did not transform this stop into an arrest finds added support in our recent decision in *United States v. Aldridge*, 719 F.2d 368 (11th Cir.1983). There, we recognized that "an officer's display of a weapon [does not] necessarily convert an investigative stop into an arrest .... The use of a gun in connection with a stop is permissible when the officer reasonably believes it is necessary for his protection." At 371. Similarly, an officer's display of his vessel's blue lights does not convert a section 1581(a) investigative stop into an arrest when the officer reasonably believes it is necessary to inform those aboard suspect vessels of the officer's identity and intent to come on board.

695

Moreover, the *Villamonte-Marquez* Court rejected the notion that Customs officers who suspect a vessel of carrying contraband may not rely on a statute such as 19 U.S.C. § 1581(a), which authorizes boarding for the inspection of a vessel's documentation. *Id.* at 2577 n. 3. As the Court noted, there would be " 'little logic in sanctioning such examinations of ordinary, unsuspect vessels but forbidding them in the case of suspected smugglers.' " *Id., quoting, United States v. Arra,* 630 F.2d 836, 846 (1st Cir. 1980). Similarly, this circuit has already determined that "the lawfulness of the boarding of a vessel is not vitiated by the fact that the officer in charge had mixed purposes, both to make a document and safety check and to search for contraband ...." *United States v. Kent,* 691 F.2d 1376, 1383 (11th Cir.1982) (citation omitted).

Two important principles emerge from the Supreme Court's decision in *Villamonte-Marquez.* First, "Customs officials, acting pursuant to the authority granted them by 19 U.S.C. § 1581(a) and without any suspicion of wrongdoing [may] board for inspection of documents a vessel that is located in waters providing ready access to the open sea." 103 S.Ct. at 2575. Second, Customs officers may rely on section 1581(a) even though they have reason to suspect the vessel of smuggling contraband. *Id.* at 2577 n. 3. In other words, Customs officers may board a vessel in Customs waters to check its documents even if the boarding serves merely as a pretext for the officers' desire to look for signs of contraband. In fact, the Customs officers in *Villamonte-Marquez* had been watching the sailboat for some time and were fairly certain that it was the vessel described by the informant's tip when they boarded to check its documents. 652 F.2d at 483.

With these principles in mind, we turn to the facts of the present case. Here, as in *Villamonte-Marquez,* Customs officials suspected vessels in Customs waters of smuggling contraband. A team of law enforcement officers placed the suspect vessels under surveillance and, when their suspicions were further aroused by the apparent offloading of contraband into a smaller craft, the officers approached the vessel

intending to satisfy their curiosity. However, the officers here, unlike those in *Villamonte-Marquez,* were greeted by smugglers who jumped into a high-powered motorboat, pulled away from the other vessel, made a 180-degree turn and rammed into the officers' boat. We see no reason to strike down the actions of these officers simply because two smugglers aborted what would have been a lawful boarding by threatening the officers with death or great bodily harm.

Likewise, we refuse to take from these officers the authority granted them by section 1581(a) simply because their true motive in boarding the vessels may have been to satisfy their suspicion that an illegal drug transfer was taking place. These officers were charged with detecting and preventing the type of operation uncovered here. They are not to be condemned for using a tool which Congress granted them by way of section 1581(a) in order to carry out that task.

We therefore hold that these officers lawfully approached and boarded the two vessels carrying 3,000 pounds of marijuana and that the seizure of contraband in plain view aboard these two boats was not unconstitutional. Accordingly, the order of the district court is

REVERSED.