**UNITED STATES of America**

**v.**

**Luis Enrique GONZALEZ.**

**Crim. A. No. 87–459.**

United States District Court,
District of Columbia.

April 28, 1988.

---

John E. Stevens, Asst. U.S. Atty., Washington, D.C., for plaintiff.

Rene Sottorio, Coral Gables, Fla., Michael S. Lieberman, Zwerling, Mark, Sutherland, Ginsburg & Lieberman, Alexandria, Va., for defendant.

MEMORANDUM ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND TO DISMISS INDICTMENT

BARRINGTON D. PARKER, District Judge.

Defendant Luis Enrique Gonzalez is charged in a two-count indictment with violation of federal narcotics laws: Count One —possession of cocaine with intent to distribute while on board a United States vessel, 46 U.S.C.App. § 1903(a); Count Two— conspiracy to possess cocaine with intent to distribute while on board a United States vessel, 46 U.S.C.App. § 1903(j). The seizure of nearly 350 pounds of cocaine from Gonzalez and his arrest were made by United States Customs officials in international waters, off the coast of the Bahamian Islands. The incident occurred in an area noted for narcotics trafficking by air drops and for vessels carrying narcotics bound for the United States.

Section 1903(h) of the statute under which defendant was charged was "intended to reach acts of possession ... or distribution committed outside the territorial jurisdiction of the United States." 46 U.S.C. App. § 1903(h). Customs officials are authorized under 19 U.S.C. § 1589a to make arrests for Title 46 § 1903 violations.

Gonzalez's counsel has moved to dismiss the indictment, contending that the Customs agents lacked authority to stop a vessel in international waters. He has also moved to suppress any statements obtained and narcotics seized on grounds that the warrantless search of the vessel was unsupported by probable cause, and that the statements given by the defendant were not voluntary.

This Memorandum Order will first address the circumstances surrounding and present factual findings and legal conclusions relating to the defendant's motion to suppress evidence. It will then address defendant's motion to dismiss the indictment.

I.

MOTION TO SUPPRESS EVIDENCE

Two witnesses testified at the suppression hearing: Warren Parks, a Customs agent, and William Reed, a Drug Enforcement Administration ("DEA") Special Agent. After consideration of their testimony, which was credible, together with the legal memoranda of counsel, the Court finds that the Customs agent had proper authority to stop and search the vessel and to seize the narcotics found aboard. The Court also finds that Gonzalez's statements were not secured in violation of his constitutional rights. Accordingly, defendant's motion to suppress is denied.

The reasons in support of the Court's findings and conclusions are set forth *infra*, pp. 659–663.

A.

*Factual Findings*

In the late afternoon of August 15, 1987, Warren Parks and two other Customs officers, Carlos Velez and Meryl Throop, were patrolling in international waters off the coast of the Bahamian Islands. With the aid of binoculars, Parks noticed a Florida styled lobster vessel, with a cabin and flying bridge attached plowing slowly through international waters. Because of his years of experience with boats and fishing off of the Florida coast, as well as off of the New Jersey and New York coast, Parks was particularly suspicious of several things: the vessel's structure, its course, and its very slow speed. Indeed, the presence of

the cabin and flying bridge caused him to doubt that it was being used for commercial fishing purposes. As he proceeded closer, he determined that the vessel's name was "Michel" and that its home port was Miami, Florida. Both identifications were painted on the stern of the boat.

The government's vessel had appropriate identification, including a flashing blue strobe light and a United States Customs flag. As it approached and was maneuvered alongside the Michel, Parks immediately identified himself and his crew as Customs officials. All wore official uniforms of the agency.

As the two boats idled side by side, Parks asked Gonzalez the origin, destination, and nature of his trip. Gonzalez readily supplied those details, indicating that the purpose of the trip was for fishing and gambling. However, he did not know the owner, could not remember the name of the person from whom he borrowed the vessel, nor whether the vessel's registration papers were on board. The absence of this highly relevant and important information also raised questions in Parks' mind.

When Parks asked permission to board, Gonzalez responded "that is no problem, come on aboard." Indeed, he assisted Parks and a second customs official in boarding the vessel.[1] Tr. Feb. 12, 1988 at 47. Once on board, Parks asked the defendant when he left Florida, when he cleared Bahamian Customs, and what kind of fishing he had been doing. Gonzalez's responses in large part were vague and uncertain. Parks also noted that the fishing tackle aboard had not been used and that it was inappropriate for fishing in that area. When Parks asked permission to look through the vessel, Gonzalez readily agreed. Tr. Feb. 12, 1988, at 50.

When Parks asked how he could gain access to the engine compartment area, Gonzalez responded by showing and assisting in removing the engine hatch cover. After gaining access to the engine compartment area, Parks immediately noticed there was no light coming through the fiberglass hull as would be normal under usual circumstances. After further search and effort, without seeing any light, Parks discovered that there was a significant difference in space between the outer hull and the engine compartment hatch on top of the deck and the area underneath the deck. Suspecting a hidden compartment, Parks then secured a portable drill from his Customs vessel's equipment so as to probe further. As he used the drill, he observed small pieces of white crystalline powder. Suspecting that the substance was cocaine, he informed his fellow officer Throop of his discovery, and immediately placed Gonzalez and the other occupant of the vessel, Luis Enrique Manzo, under arrest.

Immediately after this discovery, Gonzalez volunteered and blurted out, "Look, you are only doing your job ... I was doing mine ... I was just trying to make a little money." Id. at 57. Officer Throop then read the defendant his rights from a Miranda warning card. The two occupants of the vessel were handcuffed and the party proceeded to shore. During that portion of the trip Gonzalez, without encouragement, stated that he appreciated that the Customs officers were not "hard-nosed guys" and reiterated that "this was his first time and he was trying to make some money." Id. at 59. In response to a particular inquiry Gonzalez responded that he had a cargo of 300 to 600 pounds of cocaine aboard the Michel.

After reaching the Bahamas, Gonzalez and Manzo were transported to the United States Customs House in Miami, Florida, where Gonzalez was questioned by DEA Special Agent William Reed. As the agent began to explain the Miranda rights form, Gonzalez said "... I know you are doing your job, and I am doing mine." Tr. Feb. 18, 1988, at 11. At that point, Reed read the defendant his rights and Gonzalez wrote his initials after every statement of the rights. When Reed reached the end of the Miranda rights, he began reading a paragraph regarding waiver of those rights. Gonzalez told Reed that he refused

---

1. Transcript testimony of Warren Parks, Feb. 12, 1988. All citations refer to transcripts of testimony given at hearings held on February 12 & 18, 1988.

to sign anything, leading Reed to ask Gonzalez whether he understood his rights, and if he was willing to talk to the DEA agent without an attorney. Gonzalez answered "yes" to each question. Reed crossed out the standardized waiver paragraph, wrote out "I understand my rights," and told Gonzalez he did not have to sign it if he did not wish to and he could stop at any point. *Id.* Gonzalez signed his name after the statement, "I understand my rights." G.Ex. # 1.

Under questioning, Gonzalez told Reed that he was to be paid between 20 and 25 thousand dollars for the cocaine shipment he had on board. Reed told Gonzalez that he was in a great deal of trouble and that information would be explained to the United States Attorney. He also asked defendant if he would be interested in trying to "take the case further," in other words, give the DEA the identity of the true owner of the cocaine Gonzalez was transporting. *Id.* at 15. At that point, Gonzalez asked for an attorney, and Reed immediately concluded the interview.

*B.*

*Analysis*

1. *The Stop of the Michel was Justified*

■ The controlling federal statute relied upon by the government to support the stop of the Michel is found in the enforcement provisions of the Customs duties entitled "Boarding vessels." The section entitled "Customs officers" provides:

Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti-Smuggling Act, or at any other authorized place without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop

such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a). Under the explicit language of that section, Customs officers need not have even a modicum of suspicion to either stop or search vessels. *United States v. One 1972 44' Striker, Bonanza,* 753 F.2d 867 (11th Cir.1985) (Customs officers, lacking suspicion, may board any vessel located in waters that offer ready access to open sea in order to perform document or safety checks); *United States v. Albano,* 722 F.2d 690 (11th Cir.1984) (Customs officials, acting pursuant to 19 U.S.C. § 1581 and without any suspicion of wrongdoing, may board for inspection of a vessel's documents). It is clear that 19 U.S.C. § 1581 plainly authorizes the stop of the Michel. The detention of the vessel under the authority granted was permissible unless violative of minimum federal constitutional standards.

■ The fourth amendment imposes a general reasonableness standard upon all searches and seizures. *United States v. Caraballo,* 571 F.2d 975 (5th Cir.1978); *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under this amendment, exercise of the authority to check for safety, documentation, and obvious Customs and narcotics violations is reasonable even in the absence of any suspicion of criminal activity, let alone probable cause.

Moreover, there is a substantial distinction between a landlocked vehicle and a nautical vessel for fourth amendment purposes. The national frontiers of the ocean are more difficult to police than the territorial boundaries of the land. Brief and routine Customs detention prompted by the legitimate concerns of government for the safe and lawful operation of vessels does not intrude upon the privacy of seafarers. *See generally, United States v. Stanley,* 545 F.2d 661, 667 (9th Cir.1976), *cert. denied* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978); *United States v. Hill,* 430 F.2d 129, 131 (5th Cir.1970).

2. *The Search of the Michel was Constitutional*

■ Even before boarding the Michel, Customs Officer Parks had reasonable sus-

picion because Gonzalez was unable to identify the boat's owner or even the person who allowed him its use. Such a situation "by itself would provide reasonable suspicion of illegal activity." *United States v. Gollwitzer,* 697 F.2d 1357, 1362 (11th Cir.1983). Once aboard, Parks also noticed other things which triggered his suspicion such as the inappropriateness of the fishing gear for defendant's declared purposes.

Also after boarding and before proceeding further, Parks asked for and received permission to look around. A search under those conditions, conducted pursuant to a valid consent is constitutionally permissible. *Vale v. Louisiana,* 399 U.S. 30, 35, 90 S.Ct. 1969, 1972, 26 L.Ed.2d 409 (1970); *Katz v. United States,* 389 U.S. 347, 358 n. 22, 88 S.Ct. 507, 515 n. 22, 19 L.Ed.2d 576 (1967) (both citing *Zap v. United States,* 328 U.S. 624, 66 S.Ct. 1277, 90 L.Ed. 1477 (1946)). Law enforcement agents may conduct a valid warrantless search if they have voluntary and intelligent consent to do so. However, "when a prosecutor seeks to rely upon [such] consent ..., he has the burden of proving that the consent was, in fact, freely and voluntarily given." *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). The testimony was well within the ruling in *Bumper.*

■ As with confessions, the requirement of "voluntary" consent reflects a fair accommodation of the constitutional requirements involved. The Court must examine all surrounding circumstances to determine whether the defendant was in a possibly vulnerable subjective state or in any way coerced. *Schneckloth v. Bustamonte,* 412 U.S. 218, 229, 93 S.Ct. 2041, 2048–49, 36 L.Ed.2d 854 (1973). Here, there is no evidence of any inherently coercive tactics. And even if the defendant could have reasonably believed himself to be in custody or under arrest, his consent was voluntary and valid.

A defendant under arrest or in custody may voluntarily consent to a search, and a finding of its voluntariness will not be disturbed unless it appears that the consent was physically or mentally coerced by actions of the arresting officers which went beyond the normal duress inherent in any arrest. *United States v. Jones,* 475 F.2d 723, 730 (5th Cir.), *cert. denied,* 414 U.S. 841, 94 S.Ct. 96, 38 L.Ed.2d 77 (1973). As found above, *supra* pp. 659–660, the Customs agent and defendant engaged in general and casual conversation; defendant had "no problem" with the agents boarding his boat; they never touched him nor ordered him about; defendant even volunteered his assistance in giving them access below the deck. Defendant's counsel has shown no reason to believe that his client's responses to questioning were presumptively coerced.

### 3. *Defendant's Statements are Admissible*

■ Gonzalez was fully advised of his *Miranda* rights immediately after he was placed under arrest. Indeed, before the Customs agent began any questioning, Gonzalez volunteered and blurted out incriminatory statements indicating that he was just doing his job and trying to make money. *Miranda* does not apply to unsolicited, spontaneous and voluntary statements, not made in response to interrogation, although officers must give warnings before any follow-up questioning is resumed. *Rhode Island v. Innis,* 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). Even after defendant had been warned that anything he said may be used against him, he continued to volunteer information. He never indicated in any manner or at any time that he wished to remain silent or that he desired counsel.

Defendant was given *Miranda* warnings a second time when he arrived in Miami. At that time DEA agent Reed went over the *Miranda* rights form in detail; Gonzalez initialed each line and signed his name to the statement, commenting "I understand my rights." After reviewing the rights form, Gonzalez agreed to talk and did not request an attorney. His statements were made voluntarily and freely. However, when Special Agent Reed inquired about the true owner of the cocaine, Gonzalez for the first time indicated that

he had better talk to an attorney. At that point, Reed immediately ceased all questioning.

## II.

## MOTION TO DISMISS INDICTMENT

### CUSTOMS OFFICIALS AUTHORITY TO STOP A VESSEL IN INTERNATIONAL WATERS

Defendant is charged with violating 46 U.S.C.App. §§ 1903(a) and (j). Section 1589a of Title 19 of the United States Code gives Customs agents the authority to make arrests for 46 U.S.C.App. § 1903 violations. Under this section, entitled "Enforcement authority of Customs officers," an officer of the Customs may:

> make an arrest without a warrant for any offense against the United States committed in the officer's presence or for a felony, ... committed outside the officer's presence if the officer has reasonable grounds to believe that the person to be arrested has committed or is committing a felony....

19 U.S.C. § 1589a(3).

■ Defendant objects to the Customs officials' enforcement of these laws, claiming that the Customs Service only has authority to act within Customs waters, the waters within 12 nautical miles of the United States coast, and lacks jurisdiction to act in international waters, the water more than 12 miles from the coast. Gonzalez asserts that only the United States Coast Guard has the authority to board American vessels on the high seas beyond the 12–mile mark. The Coast Guard's jurisdiction in international waters arises out of 14 U.S.C. § 89(a).[2] To support his contention, the defendant relies upon *United States v. Sarmiento,* 750 F.2d 1506 (11th Cir.1985). *Sarmiento* concentrated on a single section of one statute, 19 U.S.C. § 1581(a),[3] with no analysis of the legislative history or other statutory grants of jurisdiction.

Defendant also relied upon a recent, unreported opinion from the Southern District of Florida, *United States v. Cariballo-Tamayo,* CR No. 87–318 (October 20, 1987) [available on WESTLAW, 1987 WL 47311], *appeal docketed,* No. 87–5995 (11th Cir. Nov. 13, 1987). In *Cariballo-Tamayo,* the trial judge (J. Ryskamp) emphasized that he was "compelled by precedent to follow *Sarmiento*" and therefore dismissed the indictment brought against a defendant arrested by Customs officers while in a vessel located in international waters. The court allowed that "the government makes a very compelling and convincing argument that the Customs Service does have jurisdiction beyond the twelve-mile limit," but it was "constrained by *Sarmiento* to follow the Eleventh Circuit precedent." *Id.* at 1, 3.

This Court is not so constrained by *Sarmiento.* It disagrees with defendant's interpretation of the relevant statutes and finds his reliance on *Sarmiento* and *Cariballo-Tamayo* misguided. The jurisdiction of the Customs Service cannot be so narrowly drawn as to frustrate the spirit of these laws, the Congressional intent evident in the legislative history of the statutes, and the goals of the corresponding regulations and interagency agreements.

### 1. *History of the Customs Service and Coast Guard Jurisdiction*

Counsel for Gonzalez fails to consider the relationship between the Customs Service and the Coast Guard and improperly characterizes them as distinct, unrelated agencies. From the outset, however, the two agencies have shared jurisdiction. Congress initially authorized Customs Officers to seize and secure any ship liable to seizure under the Act of July 31, 1789, ch. 5, 1 Stat. 29, § 29. That enactment was later repealed by the Act of August 4, 1790, ch. 35, 1 Stat. 145, which enlarged the prior regulations and established the Revenue Cutter Service as a branch of the Cus-

---

**2.** 14 U.S.C. § 89(a) provides:

The Coast Guard may make inquiries, examinations, inspections, searches, seizures, and arrests upon the high seas and waters over which the United States has jurisdiction, for the prevention, detection, and suppression of violations of laws of the United States....

**3.** *Supra,* page 661.

toms Service. Revenue Cutter Service officials were "deemed officers of the customs," and were given identical authority. In 1915, the Coast Guard became the successor of the Revenue Cutter Service and took over its personnel, vessels, duties, and powers. Act of Jan. 28, 1915, ch. 20, § 1, 38 Stat. 800. This new agency changed in name only—its jurisdictional powers remained the same and its members were still considered customs officers. Numerous courts have held that Coast Guard officers are deemed to be Customs Officers under 14 U.S.C. §§ 89 and 143. *United States v. Warren*, 578 F.2d 1058 (5th Cir. 1978) (*en banc*), *reaff'd in relevant part on reh'g*, 612 F.2d 887 (5th Cir.) (*en banc*), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980); *United States v. Zurosky*, 614 F.2d 779 (1st Cir.1979), *cert. denied* 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980). Like Customs, the Coast Guard was initially part of the Treasury Department, until it was transferred to the newly created Department of Transportation in 1967.[4]

One of the early statutes that granted authority to the two agencies limited their jurisdiction to "any place in the United States or within four leagues [12 nautical miles] of the coast of the United States." Act of September 21, 1922, ch. 356, § 581, 42 Stat. 979. This statute was the predecessor to 19 U.S.C. § 1581, the statute solely relied upon in *Sarmiento*.

A companion law to § 581, § 3072 of the Revised Statutes (now § 1581(f)), made it the duty of the Customs officers to seize any vessel and arrest any person violating any law respecting the revenue "within or without" their respective districts. The general grant of authority found in § 3072 has been interpreted to give officers of the Customs Service jurisdiction beyond Customs waters. The United States Supreme Court has held that § 3072 entitles officers of the Customs to board and search American vessels in international waters. *Maul v. United States*, 274 U.S. 501, 47 S.Ct. 735, 71 L.Ed. 1171 (1927): *United States v.*

*Lee*, 274 U.S. 559, 562, 47 S.Ct. 746, 747, 71 L.Ed. 1202 (1927). In *Maul*, the Court stated that "Coast Guard officers are to be deemed officers of the customs within the meaning of § 3072, and ... they properly may be said to have [customs] districts." *Id.* 274 U.S. at 510, 47 S.Ct. at 739. The majority clarified the geographical scope of § 3072 by explaining that "as well without as within their respective districts" includes "the sea outside customs districts." *Id.* at 511, 47 S.Ct. at 739. Justice Brandeis concurred that the phrase "without their districts" authorized customs officers to seize American vessels, regardless of their distance from the United States coast. *Id.* at 524, 47 S.Ct. at 734–44.

### 2. The Legislative History of 19 U.S.C. § 1581: The Anti-Smuggling Act of 1935

In 1935, Congress passed the Anti-Smuggling Act ("Act"), which significantly amended many of the Customs Service laws to expand the agency's jurisdiction to board vessels in international waters. The Act added or affected 19 U.S.C. §§ 1581, 1585, 1587, and 1701–09. The legislative history of this act makes it clear that Congress intended to expand, not limit, what it recognized as Customs' authority to operate on the high seas. The Senate Committee on Finance explained: "The bill is designed to accomplish this result [prevent smuggling] by extending (within the limits authorized by international law) our customs jurisdiction...." S.Rep. No. 1036, 74th Cong., 1st Sess. 1 (1935). To alleviate the defects present in the existing statutes, Congress passed the Act which provides:

> For the establishment of customs-enforcement areas in areas adjacent to but outside the 12–mile limit in which smuggling vessels are actually present.... At the present time the customs control of the United States does not extend beyond the 12–mile limit, and consequently smuggling vessels hover beyond that limit with impunity....

> § 6(b)(1), 80 Stat. 938 (1966), codified at 49 U.S.C.App. § 1655(b)(1).

---

**4.** The Coast Guard was transferred to the Department of Transportation by the Department of Transportation Act, Pub.L. No. 89–670,

*Id.* at 4. Throughout its discussion of the Act, Congress referred to extending the jurisdiction of "our customs officers" beyond the 12–mile "customs waters." The Act was passed to fill the "jurisdiction gap between the limit of control" of these government officials, which included *both* Customs and Coast Guard officers. *Id.*

The Act amended § 1581(a) to give the Customs Service additional authority to board and search vessels in international waters within a Customs-enforcement area, hovering vessels, and those vessels "at any other authorized place, without as well as within his district." 19 U.S.C. § 1581(a).

The phrase "any other authorized place" was not explained by Congress, but regulations were passed shortly after the Act took effect, which provided that any Customs officer may board any American vessel in international waters to conduct a document check. 19 C.F.R. § 162.3. The panel which decided *Sarmiento* chose not to follow the Treasury Department's fifty-year construction of the statute. 750 F.2d at 1507. This Court believes, however, that there is additional support for interpreting "any other authorized place" as including and referring to the waters beyond the 12–mile limit. First, on its face it is clear that the Customs Service has jurisdiction in Customs waters, which extends 12 miles from the United States coast. Where else could a vessel be found for the purpose of "any other authorized place" except for the seas beyond Customs waters? Secondly, subsection (g) of the same statute provides that any vessel, "within or without customs waters," that is engaged in smuggling "shall be deemed to be employed within the United States and, as such, subject to the provisions of this section." 19 U.S.C. § 1581(g). Clearly, the statute authorizes that Customs officials enforce the provisions of § 1581 in international waters, which are considered "without customs waters." Congress intended that the Customs Service be equipped to use all of its powers to prevent the introduction of illegal merchandise into the United States—these powers include the stopping and boarding of vessels in international waters.

It would defy the intention of the above statutes to deny the Customs Service the right to prevent violations of United States laws by American vessels located beyond the 12–mile mark. The legislative history shows that Congress intended the Customs Service and Coast Guard to have concurrent jurisdiction in international waters.

### 3. *Joint Task Forces and Interagency Agreements*

The Customs Service and the Coast Guard have long worked together to enforce American laws. The *Sarmiento* court's belief that to permit concurrent jurisdiction would "do violence" to the authority of the Coast Guard not only flies in the face of the legislative history and long mutual relationship between the Coast Guard and Customs Service, but it also ignores the agencies' current arrangements. Joint operations on the high seas involving the Coast Guard and Customs Service are a frequent occurrence. *See United States v. Ceballos,* 706 F.2d 1198 (11th Cir.1983); *United States v. Shelnut,* 625 F.2d 59 (5th Cir.1980); *United States v. Warren, supra,* at 1061; *United States v. Hillstrom,* 533 F.2d 209 (5th Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977). Indeed, such a joint arrangement was in effect at the time that defendant Gonzalez was arrested. The Anti-Drug Abuse Act of 1986, discussed in the following section, authorizes the Customs Service and the Coast Guard to join together in drug interdiction operations off the coast of the Bahamian Islands.

The existence of Coast Guard-Customs Service concurrent jurisdiction over international waters is further supported by the *Interagency Agreement Between the United States Coast Guard and the United States Customs Service* of July 10, 1978 ("Agreement"). This Agreement provides that:

> The USCG [Coast Guard] and USCS [Customs Service] will work in close cooperation in the national interest and support each other with respect to the suppression of trafficking in contraband on all waters where the United States

has jurisdiction, by enforcing Federal laws related to the trafficking of contraband.

Agreement at 1. The Agreement does state that the Coast Guard will have primary responsibility for at-sea enforcement which involves efforts outside the Customs waters. However, it does not claim that the Coast Guard has exclusive jurisdiction over international waters. Instead it provides that "[n]othing in this agreement is intended to restrict in any way the authority of the USCG [Coast Guard] or the USCS [Customs Service] to enforce the Customs laws within the Customs Waters, or on the high seas in accordance with existing law." *Id.* at 2.

### 4. *The Anti-Drug Abuse Act of 1986*

Congress passed the Anti-Drug Abuse Act of 1986 after finding that:

[A] balanced, coordinated, multifaceted strategy for combating the growing drug abuse and drug trafficking problem in the United States is essential in order to stop the flow and abuse of drugs within our borders;

Pub.L. No. 99–570, Title III, § 3002, 100 Stat. 3207–73 (1986), codified at 21 U.S.C. § 801 note (1987 Supp.). Congress explained that "the civilian drug interdiction agencies of the United States are currently interdicting only a small percentage of the illegal, drug smuggler penetrations in the United States every year." *Id.* To increase the efforts of agencies such as the Customs Service, Congress allocated "funds to support the interdiction of narcotics smugglers who threaten the transport of drugs through the air, on the sea, and across the land borders of the United States...." *Id.*

The centerpiece of the 1986 Act was a joint United States–Bahamas Drug Interdiction Task Force[5] which mandated the participation of the United States Customs Service along with the Coast Guard. *Id.* at § 3301. This joint operation specifically provides for Customs Service participation

in drug interdiction more than 12 miles from the Florida coast. The Act appropriated five million dollars to be used for the construction of a drug interdiction docking facility in the Bahamas to facilitate joint drug interdiction operations in and through the Bahama Islands. The joint United States Customs–Royal Bahamian Defense Force base was established at Gun Cay. As a result of negotiations between the United States and the Bahamian government, patrols were established to interdict air drops and vessels carrying drugs between the Bahamas and Florida. Investigator Parks testified that the Customs Service is actively involved in patrolling the international waters surrounding the Bahamas. Trans. of Parks' Testimony at 22.

The Anti-Drug Abuse Act of 1986 was not in effect at the time of the *Sarmiento* decision. The Act recognized the inadequacies of law enforcement efforts present at the time of the *Sarmiento:*

[T]he Federal Government civilian agencies engaged in drug interdiction, particularly the United States Customs Service and the Coast Guard, currently lack the aircraft, ships, radar, command, control, communications, and intelligence system, and manpower resources necessary to mount a comprehensive attack on the narcotics traffickers who threaten the United States.

*Id.* at § 3002. The Act was intended to strengthen the role of the Customs Service and Coast Guard in combatting narcotics smuggled from islands located more than 12 miles off the coast of the United States. The Customs Service cannot lead an all-out war on drugs if it is confined to the narrow limits argued by the defendant. On the contrary, it must work with other agencies and other countries to stop drugs before they enter the United States.

In light of the well-established relationship between the Customs Service and the Coast Guard, the legislative history of 19 U.S.C. § 1581, the Anti-Smuggling Act of

---

5. The members of the task force include: the United States Coast Guard, Customs Service, State Department, Attorney General, National Narcotics Border Interdiction System, and the

Bahamian Government. Pub.L. No. 99–570, Title III, Subtitle E, § 3301(a)(1), 100 Stat. 3207–98 (1986).

1935, the *Interagency Agreement Between the United States Coast Guard and the United States Customs Service*, the Anti-Drug Abuse Act of 1986, and the United States-Bahamian Joint Drug Interdiction Task Force, the Court finds that the United States Customs Service has authority to act in international waters in circumstances such as those involved in this case. The Court also holds that Customs officials may exercise their enforcement authority, granted under 19 U.S.C. § 1589a, in international waters. Jurisdiction over the high seas does not lie exclusively with the Coast Guard. To find otherwise, would frustrate Congressional intent and the spirit of the Customs Service laws.

### III.

### CONCLUSION

This Court determines that the United States Customs officials possessed full authority to stop the Michel in international waters, that the boarding of the vessel was proper, that the officials had probable cause, in addition to the defendant's valid consent, to search the boat. The search of the Michel, the arrest of the defendant and his companion, and the seizure of nearly 350 pounds of cocaine aboard the Michel were all constitutionally permissible. The Court also concludes that defendant's statements were not obtained in violation of any constitutional right.

Accordingly, it is this 28th day of April, 1988,

### ORDERED

That defendant's motion to suppress the evidence found aboard the Michel is denied.

That defendant's motion to suppress his statements of August 15, 1987, is denied.

The defendant's motion to dismiss the indictment is denied.