**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Luis CARIBALLO–TAMAYO,**
**Defendant–Appellee.**

**No. 87–5995.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 16th, 1989.

Rehearing and Rehearing In Banc
Denied March 27, 1989.

Dexter W. Lehtinen, U.S. Atty., Michael J. Mitchell, Asst. U.S. Atty., Miami, Fla., Sidney M. Glazer, Dept. of Justice, Washington, D.C., for plaintiff-appellant.

Theodore J. Sakowitz, Federal Public Defender, Dave Lee Brannon, Asst. Federal Public Defender, Miami, Fla., for defendant-appellee.

Before KRAVITCH and EDMONDSON, Circuit Judges, and HOFFMAN *, Senior District Judge.

KRAVITCH, Circuit Judge:

The power of the Customs Service to board and search vessels outside the customs waters is the focus of this appeal. The indictment charged appellee with possession of more than five kilograms of cocaine with intent to distribute, a violation of 46 U.S.C.App. § 1903(a).[1] After an evidentiary hearing the district court dismissed the indictment, concluding that the stop and arrest occurred outside the jurisdiction of the Customs Service and finding that appellee had not voluntarily consented to the stop and search of his vessel. The government appeals. We reverse.

## I.

In an effort to combat the illegal importation of drugs into the United States, Congress authorized the establishment of the joint United States–Bahamas Drug Interdiction Task Force in the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 3301, 100 Stat. 3207, 3207–98. Under the auspices of this task force, the Customs Service operated a vessel from a base at Guy Cay in the Bahamas. Three United States Customs officials and one official of the Royal Bahamian Defense Force manned the vessel. At approximately 11:00 a.m. on May 2, 1987 the Customs officials sighted a 28–foot Sea Ray class vessel, the Hobo II, sailing at a high speed westward towards Miami. When sighted the vessel was about six miles west of North Bimini Island in the Bahamas, three miles outside the territorial waters of the Bahamas and less than fifty miles from the United States.

Suspecting that the Hobo II was engaged in the smuggling of drugs into the United States, the Customs officials decided to intercept the vessel. When the Customs vessel came within forty yards, with blue light flashing, the Hobo II halted abruptly. One of the Customs officers asked appellee, the captain of the Hobo II, his point of origin. Appellee's response appeared inconsistent with the officer's previous sighting of the Hobo II at Cat Cay some four days earlier. The Customs officials asked for permission to board the vessel to examine the vessel's registration, and appellee consented. Appellee also consented to a later request for permission to conduct a search of the vessel, and helped with the search. The Customs officials noticed that the boat had been altered in such a way that spaces had been created for which there was no access. The officers also noticed the odor of fresh fiberglass and areas where the paint on the deck of the boat was still tacky, observations inconsistent with appellee's statement that no one had done any remodeling of the boat recently. Subsequent investigation revealed hidden compartments, one of which contained almost six kilograms of cocaine.

## II.

As the decisions of this circuit have made clear, the jurisdictions of the Coast Guard and Customs are distinct. *United States v. Sarmiento,* 750 F.2d 1506 (11th Cir.1985); *see also United States v. Ceballos,* 706 F.2d 1198 (11th Cir.1983); *United States v. Williams,* 617 F.2d 1063 (5th Cir.1980)[2] (in banc). This may at times lead us to the frustrating examination of the jurisdiction of one service when it is undisputed the actions taken would be within the jurisdiction of the other.[3] We fully share Con-

---

* Honorable Walter E. Hoffman, Senior U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. This indictment superceded a two count indictment that charged appellee with possession with intent to distribute and conspiracy to possess with intent to distribute.

2. In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (in banc) the Eleventh Cir-

cuit adopted as binding precedent the decisions of the former Fifth Circuit rendered before October 1, 1981.

3. For example, there is no doubt that the Coast Guard could properly have stopped and boarded the Hobo II—an American flagged vessel—on the high seas, because Congress has expressly given the Coast Guard that authority. *See* 14 U.S.C. § 89(a).

gress's concern with the threat drugs pose to our society. Nevertheless, we have no choice but to require that each service operates only where Congress has so empowered it.

### A.

■ We note at the outset that although Congress made the Customs Service a part of the joint United States–Bahamas Drug Interdiction Task Force, Congress did not in any way expand the jurisdiction of Customs when it gave Customs this role. The relevant provision of the Act is as follows:

> (1)(B) The Secretary of State, the Commandant of the Coast Guard, the Commissioner of Customs, the Attorney General, and the head of the National Narcotics Border Interdiction System (NNBIS), shall upon enactment of this Act, immediately commence negotiations with the Government of the Bahamas to enter into a detailed agreement for the establishment and operation of a new drug interdiction task force....

Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, § 3301(a)(1)(B), 100 Stat. 3207, 3207–98. This provision simply gives Customs a role in the task force, it does not even purport to address jurisdiction. The government points to no provision in the Act in which Congress intended to expand jurisdiction of Customs to the high seas when acting with the task force. Therefore, our analysis focuses on the specific statutory grants of jurisdiction to the Customs Service.

### B.

Title 19 U.S.C. § 1581(a) is the starting place for our analysis of the jurisdiction of Customs. That section provides that

> [a]ny officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti–Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

19 U.S.C. § 1581(a). Section 1581(a) thus empowers the Customs to board and search vessels in the customs waters, a customs-enforcement area, and "at any other authorized place."

The customs waters are in turn defined in 19 U.S.C. § 1401(j) as "the waters within four leagues of the coast of the United States." It is undisputed that the stop and search of the Hobo II took place well outside this twelve mile zone. Therefore, we must look for some other statutory authorization.

■ Section 1701(a) grants the President the authority to declare an area to be a customs-enforcement area.[4] We do not doubt that the area Customs was patrolling in this case was the type of area that Congress intended to be within the mean-

---

**4.** The relevant language of the provision is as follows:

> Whenever the President finds and declares that at any place or within any area on the high seas adjacent to but outside customs waters any vessel or vessels hover or are being kept off the coast of the United States and that, by virtue of the presence of any such vessel or vessels at such place or within such area, the unlawful introduction or removal into or from the United States of any merchandise or person is being or may be occasioned, promoted, or threatened, the place or area so found and declared shall constitute a customs-enforcement area for the purposes of this Act. Only such waters on the high seas

shall be within a customs-enforcement area as the President finds and declares are in such proximity to such vessel or vessels that such unlawful introduction or removal of persons may be carried on by or to or from such vessel or vessels. No customs-enforcement area shall include any waters more that one hundred nautical miles from the place or immediate area where the President declares such vessel or vessels are hovering or are being kept and, notwithstanding the foregoing provision, shall not include any waters more than fifty nautical miles outward from the outer limit of customs waters....

19 U.S.C. § 1701(a).

ing of customs-enforcement area. Yet the President has not declared the area east of Miami and beyond the customs waters a customs-enforcement area.[5] The decision to declare a customs-enforcement area is left to the discretion of the President, and we cannot make that declaration for the President. Therefore, because the stop and search did not take place in a customs-enforcement area, the question before us becomes whether it took place "at any other authorized place." [6]

■ In *Sarmiento* the government sought to use the language of section 1581(a) permitting Customs to board vessels "at any other authorized place" to permit the boarding of any vessel on the high seas. We rejected the government's attempt to use this limiting language to bootstrap virtually limitless jurisdiction into the statute. Thus, in ruling that section 1581(a) did not give the Customs Service jurisdiction to board and search a vessel on the high seas, we observed that "the plain language of the statute prohibits customs officers from boarding and searching vessels on the high seas." *Sarmiento*, 750

F.2d at 1506. We continue to adhere to our decision in *Sarmiento*. Yet *Sarmiento* did not strike the language "at any other authorized place" from the statute. Instead, *Sarmiento*—and we acknowledge a certain opacity in the opinion—held that section 1581(a) prohibits customs from boarding a vessel on the high seas unless that boarding is "at any other authorized place." An "authorized place" may be on the high seas, but the high seas is not *per se* an "authorized place" for the purposes of section 1581(a).[7]

### C.

■ Congress has specified in section 1587(a) that Customs may stop and search a vessel outside the customs waters if that vessel is a hovering vessel.[8] Section 1587(a) expressly directs us to section 1581. Viewing the statutory scheme as a coherent whole, we see that section 1587(a) thus authorizes a stop and search "at any other authorized place" within the meaning of section 1581(a) when the vessel is a "hovering vessel." If the Hobo II falls within the

---

5. We note that a customs-enforcement area may extend only fifty miles outward from the customs waters, a total of 62 miles from the coast of the United States. The stop and search of the Hobo II took place approximately six miles west of North Bimini Island. This location, less than fifty miles east of the United States coastline, would be within the permissible area.

6. The government has also raised the issue of whether dismissal of the indictment is the proper remedy for an unauthorized boarding. Because we conclude that Customs was authorized to board the Hobo II, we do not reach this question.

7. We share the dissent's concern that *Sarmiento* may at first blush appear to foreclose our decision today, but conclude that the better reading of that opinion is that it left undecided the issue before us. Accepting the dissent's expansive view of *Sarmiento* would mean that *Sarmiento* had sub silentio overruled the provisions of 19 U.S.C. § 1587(a) that permit officers of the Customs Service to board and examine a vessel that has become subject to pursuit within the customs waters but in the course of its flight left the customs waters and entered the high seas, as well as the provisions that permit customs to board and examine a foreign vessel "without the customs waters" when there is a special arrangement to that effect with the foreign nation.

These are just two examples—in addition to the hovering vessel exception we address in the case at hand—where we find express authority for Customs to act on the high seas. Moreover, Congress unquestionably has the power to enact § 1587(a). Thus, rather than do violence to the statutory scheme Congress has enacted and construe *Sarmiento* as prohibiting Customs from boarding any vessel on the high seas (when the *Sarmiento* court in fact could have had no justification in striking § 1587(a)), we believe it proper to construe *Sarmiento* as we have here.

8. The section reads in relevant part as follows:
    (a) *Any hovering vessel,* or any vessel which fails (except for unavoidable cause), at any place within the customs waters or within a customs-enforcement area established under the Anti–Smuggling Act, to display lights as required by law, or which has become subject to pursuit as provided in section 1581 of this title, or which, being a foreign vessel to which subsection (h) of section 1581 of this title applies, is permitted by special arrangement with a foreign government to be so examined without the customs waters of the United States, *may at any time be boarded and examined by any officer of the customs,* and the provisions of said section 1581 shall apply thereto, as well without as within his district,
    . . .
    19 U.S.C.A. § 1587(a) (emphasis added).

definition of hovering vessel, then Customs was acting within its jurisdiction.[9]

Before proceeding, one further observation is appropriate. Congress did not intend to give Customs unlimited jurisdiction when it granted Customs the power to stop and search hovering vessels. Rather, Customs may act outside the customs waters or a customs-enforcement area only in the very narrow circumstances defined by the statute.[10] Any contrary view would render the section 1587(a) limited grant of jurisdiction to Customs meaningless, and "would do violence to the Coast Guard's authority contained in 14 U.S.C. § 89(a) (1956)," *Sarmiento*, 750 F.2d at 1507. Just as in *Sarmiento* where we rejected the government's attempts to use section 1581(a) as carte blanche to permit Customs to stop any vessel on the high seas, we will not permit the limited definition of hovering vessel to achieve that same result. Even in a time of undeniable crisis such as we now face, we cannot give Customs the authority that Congress did not give. Thus Customs does not have the general authority to stop any and all vessels on the high seas; Customs does have the authority under section 1587(a), however, to board a hovering vessel, as section 1401(k)(1) narrowly defines that term.

### III.

■ With this in mind, we now turn to the case at hand. The government argued that the Hobo II was a hovering vessel under the meaning of section 1401(k)(1). The definition of hovering vessel appears in section 1401(k)(1):

> The term "hovering vessel" means any vessel which is found or kept off the coast of the United States within or without the customs waters, if, from the history, conduct, character, or location of the vessel, it is reasonable to believe that such vessel is being used or may be used to introduce or promote or facilitate the introduction or attempted introduction of

merchandise into the United States in violation of the laws respecting the revenue.

19 U.S.C. § 1401(k)(1).

The transcript of the evidentiary hearing reveals that Customs officers gave undisputed testimony that the history, conduct, character, and location of the Hobo II all supported the reasonable belief that the Hobo II was being used to introduce contraband into the United States. The location of the vessel was in an area between Bimini and Miami—the so-called "hovering vessel staging area"—notorious for smugglers. Its mid-day time of departure from Bimini was conduct consistent with the favored time of departure for smugglers who would try to mix in with the legitimate fishing vessels returning to Miami. The character of the boat was also particularly suspicious. The officers testified that smugglers favored the Sea Ray class of vessel because it was wide beamed, and thus could easily be altered to accommodate hidden compartments. In addition, the Customs officials noticed that a large tool cabinet was fastened above-deck, whereas such cabinets are customarily below-deck. Furthermore, green indoor-outdoor carpeting covered the deck, preventing access to the hatch covers leading below. Both the above-deck tool cabinet and the green carpeting covering the deck suggested to the Customs officers that the Hobo II was carrying contraband. The history of the vessel further reinforced the suspicions of the Customs officers. The vessel had been seen four days earlier at Cat Cay, even though appellee appeared to deny this when he said that he had left Miami the day before.

Although the district court concluded that *Sarmiento* prohibited the Customs Service from boarding any vessel on the high seas, the court made it clear that the government had shown that the Hobo II

---

**9.** Because we conclude that Customs had authority to board the Hobo II under § 1587(a), we need not address whether Customs may have had authority to board under another statute.

**10.** Another example is that Customs may pursue a vessel that it is seeking to board under § 1581(a) even if that vessel leaves the customs waters. 19 U.S.C. § 1587(a).

appeared suspicious.[11] Moreover, from our review of the entire record in this case, we conclude that the undisputed evidence was more than sufficient to establish that Hobo II was a hovering vessel as section 1401(k)(1) defines that term.

We share with the district court the concern that any vessel may appear to be suspicious after the fact. A vessel that stops abruptly when it spots customs, or one that tries to speed away, or one that tries to act naturally may each appear suspicious in its own way. Thus we must stress that our holding here is not meant to suggest that any vessel anywhere on the high seas is a hovering vessel. Nor do we suggest that every vessel between Bimini and Miami will fall within the section 1401(k)(1) definition of hovering vessel. In this case, as the district court noted, the history, conduct, character, and particularly location of the vessel all made the suspicion that the vessel was involved in smuggling objectively reasonable. In each case the court will have to inquire whether the suspicion of the Customs officials was objectively reasonable.

Thus, because the Hobo II was a hovering vessel under section 1587(a), the boarding was authorized by, and within the scope of, section 1581(a). The decision of the district court dismissing the indictment against appellee is accordingly REVERSED.

## WALTER E. HOFFMAN, District Judge, dissenting:

The central issue on this appeal is the power of the United States Customs Service to board and search vessels outside the United States customs waters. This issue has previously been addressed by this court in *United States v. Sarmiento*, 750 F.2d 1506 (11th Cir.1985), where the panel, in a *per curiam* opinion, stated that "the plain language of the statute [19 U.S.C. § 1581(a)] prohibits customs officers from boarding and searching vessels on the high seas." *Id.* at 1506.

### I.

The majority opinion in this case attempts to distinguish the present fact situation from the holding in *Sarmiento* through use of the statutory scheme authorizing customs jurisdiction. *See* ante pages 1182–1184. *See generally* 19 U.S.C. § 1581(a) (general jurisdiction of customs officers); 19 U.S.C. § 1701 (creation of customs enforcement zones); 19 U.S.C. § 1587 (examination of hovering vessels). Although the result reached by the majority's interpretation is reasonable and seems to have found acceptance by courts outside this circuit, *see, e.g., United States v. Gonzalez*, 688 F.Supp. 658 (D.D.C.1988), the operative language from *Sarmiento*, which is binding upon this panel, rejects the asserted authority of customs officers to board and search vessels on the high seas. The result reached by the majority opinion in this case may be a desirable outcome, especially given the pervasive threat posed by the drug problem in this country and the disadvantages facing our law enforcement authorities, including customs officers, in combating this problem. Such a result, however, should not be reached

---

**11.** For example, when the government was offering further testimony as to the various elements that make up the § 1401(k)(1) definition of hovering vessel, the court stated, "I am convinced it's a suspect vessel. You don't have to convince me. I am the finder of fact, so you have convinced me. Now let's proceed." Viewed in the context of the transcript, we construe this statement, although not using the specific terms "hovering vessel," as meaning that the government had satisfied § 1401(k)(1).

The district court was reluctant to call the Hobo II a hovering vessel because it questioned whether a vessel that was not hovering at some stationary point outside the customs waters could be considered a hovering vessel. Indeed, the paradigm of a hovering vessel is that of the mother ship staying outside the customs waters while smaller ships bring the illegal cargo, be it rum or cocaine, into the United States. Yet, as our analysis here shows, we do not find that Congress's definition is limited only to these mother ships. Not only does the § 1401(k)(1) definition not contain any such limitation, but the definition expressly includes the vessel that is directly introducing the contraband into the United States. Therefore, in what is not the first example of statutory lexigraphic irony, we note that a hovering vessel need not be one that hovers, though of course such conduct would be a factor to be considered in determining whether a vessel was suspicious.

through "opaque" distinctions with binding precedent. For this reason, I must respectfully dissent from the majority opinion in this case.

## II.

*Sarmiento* involved the authority of customs officers to board a vessel on the high seas and seize marijuana found on board. *Sarmiento* 750 F.2d at 1506.[1] The government argued that the boarding and search were within the statutory authority of customs officers [2] to board and search "at any other authorized place" because the other place where a vessel could be located (within customs waters) is included within the language of the statute. *Id.* The court broadly rejected this contention by asserting that the plain language of the statute prohibited customs officers from boarding and searching vessels on the high seas.

In support of this holding, the court said that acceptance of the government's interpretation "would make customs and coast guard jurisdiction almost concurrent, and would do violence to the coast guard's authority contained in 14 U.S.C. § 89(a) (1956)." [3] For the court to reach its decision in the present case and still adhere to the holding and language of *Sarmiento* is an impossibility. *Sarmiento* interpreted section 1581(a) as a prohibition to customs officer boardings of vessels on the high seas. The majority opinion in the present case states that this holding is not rejected but adds an exception onto the *Sarmiento* interpretation—customs cannot board a vessel on the high seas unless that boarding is at "any other authorized place." [4]

1. Whether the vessel in *Sarmiento* could have been classified as a hovering vessel within the meaning of 19 U.S.C. § 1401(k) is not clear from the facts of the opinion. The majority opinion in the present case, however, will certainly encourage customs officers operating on the high seas to seek any evidence available to satisfy the requirements for classifications as a "hovering vessel."

2. Customs officers are defined by 19 U.S.C. § 1401(i) as:

    any officer of the Bureau of Customs of the Treasury Department (also hereinafter referred to as the "Customs Service") or any commissioned, warrant, or petty officer of the Coast Guard, or any agent or other person authorized by law or designated by the Secretary of the Treasury to perform any duties of an officer of the Customs Service.

    19 U.S.C. § 1401(i).

3. A more accurate statement of the division between coast guard and customs authority is found in *United States v. Ceballos*, 706 F.2d 1198, 1199–1200 (11th Cir.1983), which is also cited in *Sarmiento*. *See Sarmiento*, 750 F.2d at 1507. In *Ceballos*, the court stated that "the jurisdiction of the customs service does not *generally* extend to the high seas. It is *usually* limited to customs waters."

    *Ceballos*, 706 F.2d at 1199–1200 (emphasis added). Although it may be argued that the court's reference in *Sarmiento* to *Ceballos* incorporated the recognition of certain exceptions to the general restriction, this reference is not sufficient to limit the broad sweep of earlier language in *Sarmiento*. This is especially true given the reference in *Sarmiento* to *United States v. Williams*, 617 F.2d 1063 (5th Cir.1980) (en banc). *Williams* stated that "[s]ection 1581(a) empowers both the customs service and the coast guard to board vessels and conduct customs searches, *but only in customs waters*—within the twelve-mile limit." *Id.* at 1073. The court in *Williams*, therefore, also limited the application of section 1581(a) to customs waters and did not recognize any exceptions to this application.

4. The correctness of the court's addition is not at issue. The authority of section 1587(a) contemplates several situations in which a customs officer is authorized to board a vessel "as well without as within his district." 19 U.S.C. § 1587(a). One such situation authorizing boarding and search under section 1587(a) is when customs officers encounter a "hovering vessels." A "hovering vessel", as defined in 19 U.S.C. § 1401(k), may be "any vessel which is found or kept off the coast of the United States within or without the customs waters." 19 U.S.C. § 1401(k). Thus, if customs officers can satisfy the proof that a ship is a hovering vessel, they may board the ship under authority of 19 U.S.C. § 1587(a) even if the ship is not within customs waters.

    Such a result appears to have been the intention of Congress in passing section 1587, although the evil contemplated during passage of the Anti–Smuggling Act of 1935 was illegal importation of alcohol rather than the current problem imposed by drug importation. *See generally* S.Rep. No. 1036, 74th Cong., 1st Sess. (1935); H.Rep. No. 868, 74th Cong., 1st Sess. (1935). The Senate report accompanying the hovering vessel statute stated that section 587 (19 U.S.C. § 1587) of the 1935 act—

    [s]ubjects to customs examination in some cases outside of customs waters, vessels which are displaying particularly suspicious indicia of smuggling activity, such as failing to stop when properly required by customs officers,

As this exception does not clearly arise from a reading of *Sarmiento,* I respectfully dissent from the majority opinion insofar as it deviates from the binding authority of this circuit. The proper avenue to correct any misinterpretations in *Sarmiento* should be an *en banc* review of the issues in this case.

hovering suspiciously off the coast, or failing to display proper lights.
S.Rep. No. 1035, 74th Cong., 1st Sess. at 13 (1935).

This interpretation is further supported by reviewing the legislative history behind the 1936 enactment of Coast Guard authority to board American vessels on the high seas. *See* 14 U.S.C. § 89. *See also* S.Rep. No. 2211, 74th Cong., 2d Sess. (1936); H.Rep. No. 2452, 74th Cong. 2d Sess. (1936).

Should this issue come before this circuit for *en banc* review, recognition should be given to the authority of customs officers to board and search vessels either outside the customs waters if they meet the requirement of 19 U.S.C. § 1587 or within a customs enforcement zone as defined in 19 U.S.C. § 1701.