UNITED STATES of America

v.

Luis Enrique GONZALEZ, Appellant.

No. 88–3092.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1989.

Decided May 16, 1989.

Jacqueline E. Gonzalez, of the bar of Florida, pro hac vice, by special leave of Court, with whom Rene A. Sotorrio, Coral Gables, Fla., was on the brief, for appellant.

Sidney M. Glazer, Atty., Dept. of Justice, Bethesda, Md., with whom Jay B. Stephens, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before MIKVA, BUCKLEY and WILLIAMS, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

Concurring opinion filed by Circuit Judge MIKVA.

STEPHEN F. WILLIAMS, Circuit Judge:

Luis Enrique Gonzalez appeals from his conviction for possession of cocaine with the intent to distribute. Gonzalez was arrested by customs agents who stopped The Michel, a boat which he captained, while it cruised in international waters. Gonzalez contends that the stop of his vessel was illegal because the Customs Service lacked statutory authority to stop vessels on the high seas. He also claims that the Fourth Amendment requires suppression of the cocaine seized during a warrantless search of The Michel because the customs agents lacked probable cause to stop or search the vessel.

We agree with the district court that the search of Gonzalez's vessel was conducted with his consent and thus did not violate the Fourth Amendment. We find the issue of the Customs Service's authority to stop a vessel in international waters more problematic. The government argues that several statutory provisions provide the Service with jurisdiction to act on the high seas. After assessing these provisions, we conclude that the only statutory basis for the stop is 19 U.S.C. § 1587(a), authorizing Customs to stop and board "hovering vessels" as defined by 19 U.S.C. § 1401(k), wherever located. We remand the case to the district court, accordingly, so that it

can determine whether Gonzalez's boat was indeed a hovering vessel.

* * *

On August 15, 1987 a Customs Service vessel was patrolling the international waters off the Bahamas. An officer using binoculars, Warren Parks, noticed The Michel, an unusual lobster vessel with a registration number that indicated its home port was Miami. It was atypical for several reasons. There were structural alterations that tended to prevent it from serving as a commercial fishing vessel and that gave it the appearance of a sport fishing vessel, yet other characteristics (its being a "flat bottom single engine diesel type boat") made it too slow for either purpose. Its course was one used frequently for drug trafficking. See Testimony of Warren Parks, Appendix of Appellant 17–18.

The customs officers decided to investigate; they used a flashing blue strobe light to signal The Michel's crew to stop. As the government boat maneuvered alongside, Parks identified himself to Gonzalez and inquired about the origin, destination and purpose of Gonzalez's trip. The defendant answered in some detail, stating that the boat was being used for fishing and gambling.

During further questioning, however, Gonzalez aroused Parks's suspicions. He was unable to identify The Michel's owner, and he claimed not to remember from whom he borrowed the boat or whether the registration papers were on board. While Gonzalez said that four people had been on the boat for much of its trip, The Michel did not have bunks for four. Gonzalez identified the boat's destination as the Rusty Pelican Marina in Miami, which Parks knew of as the home base for many vessels with hidden compartments and the site of several seizures of contraband.

At this point, Parks requested permission to board The Michel; Gonzalez told him, "[T]hat is no problem, come on board." *United States v. Gonzalez,* 688 F.Supp. 658, 660 (D.D.C.1988). During his search, Parks discovered cocaine in a hidden compartment in the fiberglass hull of the vessel. After Parks arrested him, Gonzalez spontaneously made several incriminating statements.

The defendant was indicted for possession of five kilograms of cocaine with the intent to distribute it, in violation of 46 U.S.C.App. §§ 1903(a) and (g). The district court denied both his motion to suppress his incriminating statements and the cocaine seized from The Michel and his motion to dismiss the indictment. *Gonzalez,* 688 F.Supp. at 667. Gonzalez entered a plea of guilty but preserved his right to maintain this appeal.

### THE JURISDICTION OF THE CUSTOMS SERVICE ON THE HIGH SEAS

■ When the Customs Service successfully stopped The Michel by means of a flashing strobe light, it conducted a seizure that triggered the protections of the Fourth Amendment. See *United States v. Gollwitzer,* 697 F.2d 1357, 1360 (11th Cir. 1983) (determining whether a stop by the Customs Service was reasonable under the Fourth Amendment); *cf. Brower v. County of Inyo,* — U.S. —, —, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (seizure occurred when a car was stopped by police roadblock); *United States v. Morrison,* 546 F.2d 319, 320 (9th Cir.1976) (use of siren or flashing light to stop motorist constitutes a seizure).

Gonzalez argues that in *United States v. Ramsey,* 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), the Supreme Court formulated a two-part test to determine whether a search or seizure by Customs is lawful under the Fourth Amendment. *Ramsey* plainly did not do so explicitly. Any inference that it did so must be drawn from the Court's approach of first deciding that Customs' actions had been authorized by statute and then assessing the reasonableness of the search. *Id.* at 611, 97 S.Ct. at 1976. The Fifth Circuit has indeed drawn the inference Gonzalez proposes, reasoning that "a warrantless seizure or search in the complete absence of authority —a lawless governmental intrusion—is unconstitutional per se." *United States v. Williams,* 617 F.2d 1063, 1074 (5th Cir. 1980) (en banc).

A difficulty with this analysis is that while the Supreme Court has concluded that the purposes of the Fourth Amendment are served by exclusion of evidence obtained in violation of its standards, *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), it seems a quite distinct issue whether Congress's purposes are served by an exclusionary remedy for violations of the statutes setting forth the jurisdiction of federal law enforcement agencies. Yet Gonzalez's proposed reading of *Ramsey*, folding the statutory issue into the constitutional one, would entail use of the exclusionary remedy for the statutory violation without regard to congressional purpose.[1] Nonetheless, we assume without deciding that statutory authority for the Customs Service's actions is essential to the government's use of the resulting evidence.

Thus we begin by determining whether Customs has jurisdiction to stop vessels in the international waters off the Bahamas. Generally, the Coast Guard has jurisdiction over ships in international waters, and the Customs Service's jurisdiction is limited to the "customs waters," located primarily within 12 miles of the United States coast. *United States v. Ceballos*, 706 F.2d 1198, 1200 (11th Cir.1983); 19 U.S.C. §§ 1581(a), 1401(j). The government cites several statutes and regulations that purportedly contain exceptions to this general rule. We find authority only in one, the "hovering vessel" provision of 19 U.S.C. § 1587(a).

*19 U.S.C. § 1581(f)*

■ 19 U.S.C. § 1581(f) directs customs officers to "seize and secure . . . any vessel . . . as well without as within their respective districts" if the vessel has become "liable to seizure." The statute does not define "seizure," nor does it indicate whether a stop such as the one here would constitute a seizure under § 1581(f). Neverthe-

less, we will assume, without deciding, that just as the Fourth Amendment concept of seizure encompasses a stop by Customs, the language of § 1581(f) is sufficient to give Customs the authority to conduct investigatory stops. But see 19 U.S.C. § 1581(a) (specifically authorizing Customs to "hail and stop" vessels).

Section 1581(f) states that its authority applies "as well without as within [the officers'] respective districts"—the same wording that appeared in its predecessor statute, Rev.Stats. § 3072. See *Maul v. United States*, 274 U.S. 501, 505, 47 S.Ct. 735, 737, 71 L.Ed. 1171 (1927). In *Maul* the Supreme Court rejected a claim that the jurisdictional phrase meant only "within other customs districts as within [the acting officers'] own," *id.* at 510, 47 S.Ct. at 739, and held instead that it authorized customs agents to seize vessels on the high seas, as well as within customs waters, *id.* at 510–11, 47 S.Ct. at 139–38. See also *United States v. Lee*, 274 U.S. 559, 562, 47 S.Ct. 746, 747, 71 L.Ed. 1202 (1927) (§ 3072 allows seizures on the high seas in certain circumstances). The search in question had been conducted by Coast Guard officers, but as they were acting as customs agents, the majority looked to statutes defining customs authority. Justice Brandeis wrote separately for himself and Justice Holmes, taking the view that the search was more properly upheld as an incident to the Coast Guard's "police duties of ocean patrol." *Maul*, 274 U.S. at 512, 47 S.Ct. at 739. He was concerned that the Court's view carried a negative implication for the Coast Guard's implied authority. *Id.* at 513, 47 S.Ct. at 740. Congress ultimately responded to this concern by amending the predecessor to 14 U.S.C. § 89 to clarify that the Coast Guard had jurisdiction on the high seas as an incident to its general police powers. See H.R.Rep. No. 2452, 74th Cong., 2d Sess. (1936); see also *United States v. Warren*, 578 F.2d 1058, 1068–

---

**1.** Compare *United States v. Benevento*, 836 F.2d 60, 69–70 (2d Cir.1987) (suppression not appropriate when customs agent searched luggage without the reasonable suspicion required by statute), *cert. denied*, —— U.S. ——, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988), and *United States v. Chemaly*, 741 F.2d 1346, 1357–60 (11th Cir.

1984) (Tjoflat, J., dissenting) (rejecting suppression because Congress intended no such remedy), *reinstated sub nom. United States v. Bacca-Beltran*, 764 F.2d 747 (11th Cir.1985) (en banc), with *Chemaly*, 741 F.2d at 1354 n. 2 (majority opinion concludes Congress intended exclusion remedy).

70 (5th Cir.1978) (explaining the legislative response to *Maul*), *rev'd in part on other grounds*, 612 F.2d 887 (5th Cir.), *cert. denied*, 446 U.S. 956, 100 S.Ct. 2928, 64 L.Ed.2d 815 (1980). The primary question here is whether the majority's reading of § 3072 extends to its successor.

Congress's reenactment of § 3072 occurred eight years after *Maul* and *Lee*, as part of the Anti–Smuggling Act. The accompanying congressional reports appear to reflect a mistaken assumption that *Maul* pertained only to the authority of Coast Guard officers—a natural enough mistake given the facts of the case. The reports explain that the Act was necessary because customs enforcement (then largely focused on forbidden alcoholic beverages) had been hampered "[s]ince our laws do not extend beyond the 12–mile limit." S.Rep. No. 1036, 74th Cong., 1st Sess. 4 (1935); see also H.R.Rep. No. 868, 74th Cong., 1st Sess. 4 (1935) (similar). The express purpose of the new legislation was to extend customs jurisdiction past "the existing 12–mile limit." S.Rep. No. 1036 at 1, 4; H.R. Rep. No. 868 at 1, 3. The scheme designed to achieve that goal consisted of several explicit statutory exceptions to the assumed 12–mile restriction. See *United States v. Romero–Galue*, 757 F.2d 1147, 1152–53 (11th Cir.1985) (explaining the statutory pattern). For example, the Act allowed the president to establish "customs-enforcement areas in areas adjacent to but outside the 12–mile limit." S.Rep. No. 1036 at 3; H.R.Rep. No. 868 at 3; 19 U.S.C. § 1701(a). In another exception discussed at greater length below, Congress defined a class of boats as "hovering vessels" and authorized customs officers to stop them anywhere. S.Rep. No. 1036 at 11; H.R. Rep. No. 868 at 7; 19 U.S.C. §§ 1401(k), 1587(a).

We assume that the mere presence of legislative history reflecting an underestimate of customs authority, coupled with congressional reenactment, would not in itself strip the reenacted provision of its authoritative construction. Here, however, Congress did far more than reenact § 3072. It established a new system of allocating customs service responsibility, with general

authority within customs waters and limited authority, under specific exceptions, beyond. The new system is internally coherent if the *Maul* construction is dropped, but is at least awkward if it is retained. Accordingly, we believe that the Anti–Smuggling Act must be read as declining to transfer the Supreme Court's reading of old § 3072 over to the new § 1581(f). Thus we reject the government's contention that § 1581(f) authorizes customs agents to stop a vessel in international waters.

### *19 U.S.C. § 1581(a)*

■ The first grant of jurisdiction to customs officers is 19 U.S.C. § 1581(a), stating:

> Any officer of the customs may at any time go on board of any vessel or vehicle at any place in the United States or within the customs waters or, as he may be authorized, within a customs-enforcement area established under the Anti–Smuggling Act, or at any other authorized place, without as well as within his district, and examine the manifest and other documents and papers and examine, inspect, and search the vessel or vehicle and every part thereof and any person, trunk, package, or cargo on board, and to this end may hail and stop such vessel or vehicle, and use all necessary force to compel compliance.

The government argues that this subsection contains two phrases which grant the Customs Service jurisdiction over vessels in international waters.

First, the government argues that the reference to "any other authorized place" encompasses any "place" for which authority is provided by regulations of the Customs Service itself. These include one which purportedly authorizes customs officers to board and search "[a]ny American vessel on the high seas." 19 C.F.R. § 162.3(a)(2) (1988).

We think such a reading of § 1581(a) precluded by the structure of the statute. It sits awkwardly with the statutory pattern of limiting the Service's operations to the 12–mile zone, subject to very specific exceptions. One of the exceptions, 19

U.S.C. § 1701(a), flags the awkwardness, for it requires *presidential* action to authorize a "customs-enforcement area" (referred to in § 1581(a)) on the high seas. The requirement of decision at such a high level would seem anomalous if the Service acting alone could freely expand its jurisdiction by regulation. Thus we join the Eleventh Circuit in rejecting this contention. *United States v. Sarmiento*, 750 F.2d 1506, 1507 (11th Cir.1985).

Second, the government asks us to give the words "without as well as within his district" the same expansive reading that the Supreme Court gave the almost identical phrase in § 3072. We believe that to do so here would destroy the statutory pattern just as it would if applied to § 1581(f) and accordingly reject the claim. Indeed, it would do so even more acutely; while a broad reading of § 1581(f) might be reconciled to the statutory pattern on the theory that *Lee* limits § 1581(f) seizures to cases of probable cause or at least reasonable suspicion (compare 274 U.S. at 563, 47 S.Ct. at 748, finding probable cause, with *id.* at 560, 47 S.Ct. at 747, describing the seized boat's conduct), § 1581(a) appears to contain no such predicate.

### 19 U.S.C. § 1587(a)

■ Under the authority granted in 19 U.S.C. § 1587(a), customs officers may board and examine a "hovering vessel" regardless of its location. A "hovering vessel" is defined by the Anti–Smuggling Act as

> any vessel which is found or kept off the coast of the United States *within or without the customs waters*, if, from the history, conduct, character, or location of the vessel, it is reasonable to believe that such vessel is being used or may be used to introduce or promote or facilitate the introduction or attempted introduction of merchandise into the United States in violation of the laws respecting the revenue.

19 U.S.C. § 1401(k) (emphasis added). Not only does § 1587(a) expressly authorize customs agents to search and seize hovering vessels, but the provision represents an authorization transforming the high seas into "any other authorized place" under § 1581(a) if customs agents act upon a hovering vessel. *United States v. Cariballo–Tamayo*, 865 F.2d 1179, 1183 (11th Cir. 1989). We note that § 1587(a) itself makes the provisions of § 1581 applicable to hovering vessels.

### Other Possible Sources of Jurisdiction

■ The government argues that 46 U.S.C.App. § .277, which allows Customs to stop vessels for certain purposes, authorizes actions on the high seas because it contains no geographical limitation. § 277 applies, however, only to inspections of the vessel's "register or enrollment or license ... or any document in lieu thereof." Although Parks inquired as to the location of The Michel's registration papers, an inspection of these documents was never the purpose of the stop or the search. Moreover, such a broad reading of § 277 would undermine our understanding of the congressional scheme embodied in the Anti–Smuggling Act, limiting customs jurisdiction to the customs waters except as specifically provided.

■ The government also points to the Interagency Agreement Between the United States Coast Guard and the United States Customs Service, Appendix of Appellant 81–86, and the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 *et seq.* (1986), as additional support for the proposition that the Custom Service's jurisdiction extends to the high seas. We believe these provisions essentially irrelevant. Neither alters the jurisdiction of Customs established by the Anti–Smuggling Act; they merely provide for coordination of the Service's activities with those of other entities concerned with stopping the flow of illegal drugs into this country. While the Anti–Drug Abuse Act establishes a Bahamas–United States Task Force, see Pub.L. No. 99–570, § 3301, 100 Stat. 3207–98 (1986), it contains no provision extending the jurisdiction of Customs beyond that authorized elsewhere.

### Application of the "Hovering Vessel" Provision, 19 U.S.C. § 1587(a)

■ If The Michel qualified as a hovering vessel, customs agents had the authori-

ty to stop it. Unfortunately the district court made no findings as to whether the "history, conduct, character, or location" of The Michel would have made it reasonable to believe that the vessel was being used, or might be used, to introduce contraband into the country. We therefore remand the case to the district court to make this determination.

Gonzalez argues that The Michel cannot be a hovering vessel, as "the paradigm of a hovering vessel is that of the mother ship staying outside the customs waters while smaller ships bring the illegal cargo ... into the United States." *Cariballo–Tamayo*, 865 F.2d at 1185 n. 11; see also *United States v. May May*, 470 F.Supp. 384, 388 (S.D.Tex.1979). But Congress has chosen its own, broader definition of the term, and that definition controls. Compare Alf Ross, "Tu–Tu," 70 Harv.L.Rev. 812 (1957) (cautioning against reification of terms that merely link a set of facts with specific legal consequences). Thus the district court need not find that The Michel was a hovering vessel of the classic type, but only that it satisfied the terms of 19 U.S.C. § 1401(k). See *Cariballo–Tamayo*, 865 F.2d at 1185 n. 11 ("a hovering vessel need not be one that hovers, though of course such conduct would be a factor to be considered in determining whether a vessel was suspicious").[2]

### THE REASONABLENESS OF THE STOP AND SEIZURE OF THE MICHEL

■ The Fourth Amendment imposes a reasonableness standard on all seizures; for an investigatory stop, this means only a reasonable suspicion of illegal conduct. *Terry v. Ohio*, 392 U.S. 1, 20–27, 88 S.Ct. 1868, 1879–83, 20 L.Ed.2d 889 (1968). This parallels the requirement in § 1401(k) that it be "reasonable to believe that [the] vessel is being used or may be used" to introduce merchandise in violation of the revenue laws. Thus, if the district court finds The Michel to be a hovering vessel, it necessarily will have found that Parks had reasonable suspicion to conduct an investi-

gatory stop. We note that the Eleventh Circuit has held that the Constitution does not impose even a reasonable suspicion requirement on customs officials stopping a boat that is capable of ocean travel and is located within their jurisdiction. See, e.g., *Gollwitzer*, 697 F.2d at 1360–62. In view of the requirements of § 1401(k), we need not consider whether any independent constitutional prerequisite applies.

■ In addition to questioning the reasonableness of the stop, Gonzalez argues that the *search* of his vessel was unconstitutional because Parks lacked probable cause to believe that the defendant had violated any laws. As the district court observed, *Gonzalez*, 688 F.Supp. at 662, probable cause is not required when a search is conducted pursuant to valid consent. See, e.g., *Katz v. United States*, 389 U.S. 347, 358 n. 22, 88 S.Ct. 507, 515 n. 22, 19 L.Ed.2d 576 (1967). The record amply supports the district court's finding that Gonzalez's consent was given freely and voluntarily.

\*   \*   \*

■ The defendant also contends that the incriminating statements he made after the cocaine was found in The Michel's hidden compartment were involuntary. On the contrary, the lower court properly found that Gonzalez's initial remarks at the moment of arrest were spontaneous and not the product of questions that would require *Miranda* warnings, see *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), and that his statements made after receiving such warnings were voluntary (and in some cases spontaneous as well). *Gonzalez*, 688 F.Supp. at 662. We agree with the district court that no admissions made by the defendant were coerced in any way. *Id.* at 662–63.

\*   \*   \*

We remand the case to the district court for it to determine if The Michel was a hovering vessel as defined by 19 U.S.C. § 1401(k). If so, then the agents had jurisdiction to act on the high seas and reason-

---

**2.** This disposition is of course without prejudice to the government's contention that suppression should not follow from an absence of statutory authority. See text above at pp. 877–878.

able suspicion enough to justify the investigatory stop (assuming that the Fourth Amendment requires it in this context). If Customs lacked statutory authority to stop The Michel, however, the court will have to determine the appropriate remedy.

MIKVA, Circuit Judge, concurring:

I agree with the holding and the reasoning of my colleagues' decision in this case. I write separately only to note my disagreement with the need for speculating on whether or not the exclusionary rule applies to statutory violations as it does to constitutional violations. Resolution of this issue is not necessary to our decision today.