**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Chong–Biao CHEN; Ok Son Chen, aka Debbie Chin; Xue Duan Chen; Guan Chong Chen; Rong Hua Chen; Kan Chong Chen; Kong Gian Chen; Jia Zhun Chen, aka Chong Tia Chen; Ping Xae Chen, Defendants–Appellees.**

No. 92–50210.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1993.

Decided Aug. 23, 1993.

George S. Cardona, Asst. U.S. Atty., Los Angeles, CA, for plaintiff-appellant.

William J. Genego, Santa Monica, CA, Alan I. Rubin, Epstein, Adelson & Rubin, Morton H. Boren, Hauptman & Boren, Los Angeles, CA, argued and on the briefs; Vicki I. Podberesky, Nasatir & Hirsch, Santa Monica, CA, Marvin W. Granger and Hari S. Lal, Lal, Lal & Brahmbhatt, Anaheim, CA, Michael Artan, Los Angeles, CA, Anna Ho, Torrance, CA, David R. Reed, Beverly Hills, CA, on the brief for the defendants-appellees.

Before: WALLACE, Chief Judge, SNEED and HALL, Circuit Judges.

WALLACE, Chief Judge:

The government appeals from the district court's judgment dismissing the indictment charging nine defendants with conspiracy to smuggle aliens into the United States in violation of 18 U.S.C. § 371 and 8 U.S.C. § 1324(a)(1). The district court claimed authority to dismiss the indictment pursuant to its supervisory powers because it determined that agents of the Immigration and Naturalization Service (INS) acted outside their statutory authority by conducting an undercover investigation in international waters. The district court exercised jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction over the government's timely appeal under 18 U.S.C. § 3731, and we reverse and remand.

I

In July 1991, a confidential informant contacted the INS regarding two persons—Chong–Biao Chen and Ok Son Chen, both defendants in this case—who had asked the informant about renting a boat for the purpose of meeting a Chinese ship, the Li Munn, off the coast of California and transporting 20 Chinese persons from the Li Munn to the United States mainland. The INS then began an undercover investigation into possible violations of the immigration laws.

With INS approval, the informant twice met with Chong–Biao and Ok Son and settled on a price of $50,000 for a captain and a boat capable of transporting 80 Chinese persons from a point about 100 miles offshore. Chong–Biao and Ok Son gave the informant a New York telephone pager number and told him to contact them when he located a boat suitable for the charter; they then returned to New York.

On instructions from the INS, the informant located a suitable boat, the Corinthian. The informant contacted Chong–Biao and Ok Son, and during a series of telephone conversations it was agreed that they would charter

the Corinthian along with her captain and crew. The INS intended to include undercover agents posing as crew members.

On August 21, 1991, the Undercover Operations Review Committee of the United States Department of Justice (Review Committee) authorized the INS agents to proceed with the proposed undercover operation involving the use of the Corinthian in international waters.

On August 23, three defendants met on the Corinthian with the informant and an undercover INS agent posing as the boat's owner. Several other INS agents were present in the guise of crew members. These defendants informed the INS agents that they were to meet with a Chinese ship approximately 240 miles off the California coast, and 130 Chinese persons would be transferred to the Corinthian. The defendants and the agents also discussed how to transport the aliens to New York after their arrival in the United States.

On August 27, the Review Committee considered a revised plan for the INS's proposed undercover operation, which had been modified in light of the August 23 meeting. The Review Committee was aware that the INS agents would conduct the undercover investigation in international waters when approval was given. The Review Committee guidelines specifically contemplate an INS "undercover operation [that] will be conducted substantially outside the United States." INS Undercover Operation Guidelines at IV.A.(2). The operation was also approved by the United States Attorney for the Central District of California and an Assistant Attorney General in the Department of Justice, both of whom knew that the operation would be conducted in international waters.

When the Corinthian set out from the harbor at San Pedro, California on August 29, seven INS agents and two United States Coast Guard officers, all operating undercover, as well as two of the defendants were on board. The Coast Guard officers were present only to provide assistance if necessary; they had no supervisory responsibility for the investigation, which was under the sole control of the INS. The next day the Corinthi-

an met the Li Munn in international waters approximately 320 miles from the California coast. As the INS agents watched and videotaped, approximately 132 Chinese persons, including four of the defendants in this case, transferred from the Li Munn to the Corinthian. Upon the Corinthian's return to San Pedro harbor on September 1, the aliens were transported to a house in Garden Grove, California, which was kept under INS surveillance.

On September 19, a federal grand jury returned a five count indictment charging the nine defendants with crimes relating to the smuggling of the Chinese aliens into the United States. Count one charged all nine defendants with conspiring in violation of 18 U.S.C. § 371 to smuggle aliens into the United States in violation of various provisions of 8 U.S.C. § 1324(a)(1). Counts two through five, which charged individual defendants with specific acts of alien smuggling in violation of section 1324(a)(1), were dismissed by the district court upon motions filed by defendants. The government has not appealed from these dismissals.

On January 29, 1992, the district court granted the defendants' joint motion to dismiss the indictment, which only had count one remaining, based on its conclusion that the INS agents had no legal authority to conduct an undercover investigation more than 100 miles offshore. The district court relied on 8 U.S.C. § 1357(a)(3) and its implementing regulation, 8 C.F.R. § 287.1(a)(2) (1991), which limit warrantless searches by INS agents to the area within 100 miles of the United States border. The district court held that this is the only provision in the INS's governing laws that authorizes extraterritorial activity. The court concluded that because the operation in question exceeded the 100 mile limit, it was unauthorized.

II

■ We review de novo the district court's legal conclusion that the INS agents acted outside their statutory and regulatory authority in conducting the offshore undercover investigation at issue in this case. *See United States v. Gomez–Osorio*, 957 F.2d 636, 639 (9th Cir.1992).

The specific authority of INS agents, acting without a warrant, to board and search vessels for aliens is conferred by 8 U.S.C. § 1357:

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

. . . . .

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States....

Immigration regulations define the term "reasonable distance" to mean "within 100 air miles from any external boundary of the United States." 8 C.F.R. § 287.1(a)(2) (1991).

On its face, section 1357(a)(3) places no general territorial restrictions on the exercise of INS authority. Rather, the section confers on INS agents broad powers to conduct warrantless searches without probable cause, and places a territorial restriction on the exercise of that broad power. The district court, however, concluded that because no other statutory provision or regulation specifically gives the INS authority to operate outside of United States territory, the INS is as a matter of law without such authority except as provided by section 1357(a)(3). *Cf. United States v. Leyba*, 627 F.2d 1059, 1065 (10th Cir.) (refusing to read section 1357(a)(3) as imposing general territorial limit on INS authority to conduct otherwise constitutional searches), *cert. denied*, 449 U.S. 987, 101 S.Ct. 406, 66 L.Ed.2d 250 (1980).

The defendants concede that the criminal immigration laws apply extraterritorially and that the Coast Guard may enforce those laws extraterritorially. As the defendants correctly recognize, the sole issue before us is thus whether Congress gave the INS authority to conduct law enforcement activity outside the United States. The defendants fail to recognize, however, that Congress need not confer such authority *explicitly* and *directly* on the INS agents themselves. According to 8 U.S.C. § 1103(a):

The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens.... He shall have control, direction, and supervision of all employees ... of the Service. He shall establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and *perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter....* He shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens and shall, in his discretion, appoint for that purpose such number of employees of the Service as to him shall appear necessary and proper.... [A]fter consultation with the Secretary of State, he may, whenever in his judgment such action may be necessary to accomplish the purposes of this chapter, detail employees of the Service for duty in foreign countries.

(Emphasis added.) The statute also provides that the Commissioner "shall be charged with any and all responsibilities and authority in the administration of the Service and of this chapter which are conferred upon the Attorney General as may be delegated to him by the Attorney General." 8 U.S.C. § 1103(b). We draw four conclusions from these provisions. First, Congress has provided extremely broad powers to the Attorney General for the enforcement of the immigration laws. Second, we have already inferred from the nature of immigration offenses—such crimes "negatively affect the United States even when the conduct takes place outside the country"—that Congress intended 8 U.S.C. § 1324 to apply extraterritorially. *United States v. Aguilar*, 883 F.2d 662, 692 (9th Cir.1989), *cert. denied*, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991). We likewise infer from the broad language of section 1103(a) that Congress intended to grant the Attorney General the corresponding power to enforce the immigration laws both within and without the borders of the United States. Third, the Attorney General may delegate any of those powers to the Commissioner. Fourth, the Attorney General has direct control over all employees of the

INS, whom he may call upon to guard United States borders.

It is apparent from the face of section 1103(a) and (b) that if the Attorney General deemed it necessary, she could, by herself, undertake an undercover investigation of the type involved here, as long as her actions did not directly contravene any constitutional provision. *See United States v. Davis*, 905 F.2d 245, 248 (9th Cir.1990) (extraterritorial application of statute must "not violate the due process clause of the fifth amendment"), *cert. denied*, 498 U.S. 1047, 111 S.Ct. 753, 112 L.Ed.2d 773 (1991). It follows, again from the face of the statute, that she could, in her discretion, delegate the authority to conduct such an operation, or even the discretion to decide whether such an operation is necessary, to the Commissioner.

The Attorney General has done exactly that:

> Without divesting the Attorney General of any of his powers, ... there is delegated to the [INS] Commissioner the authority of the Attorney General to direct the administration of the Service and to enforce the Act and all other laws relating to the immigration and naturalization of aliens. The Commissioner ... may redelegate any such authority to any other officer or employee of the Service.

8 C.F.R. § 2.1 (1991). Thus, Congress has delegated broad enforcement powers to the Attorney General, who in turn has delegated those powers to the Commissioner of the INS, who in turn is authorized to delegate those powers to INS agents. The defendants' assertion that "the INS has no statutory authority to act as law enforcement officers on the high seas more than 300 miles from the United States" overlooks this chain of delegated authority. This chain of authority, encompassing the power to take such acts as are deemed necessary for the enforcement of the immigration laws, including extraterritorial enforcement, provides the legal basis for the INS and its agents to undertake offshore undercover investigations such as this one. This conclusion is borne out in the present case by the fact that the INS agents did not act solely on their own discretion, but sought approval from the Review Committee, a United States Attorney, and an Assistant Attorney General, all of whom answer directly to the Attorney General herself.

We therefore disagree with the district court's negative implication from section 1357(a)(3). The defendants are only partially correct in stating that the "law enforcement powers granted to the INS are set forth in 8 U.S.C. § 1357(a)." This assertion is incomplete; because the Attorney General may delegate her authority, the list of powers granted in section 1357(a) cannot be read as exhaustive. The cases relied on by the defendants are distinguishable; all of them involved the exercise by Customs officers of a warrantless board and search authority analogous to that provided for by section 1357(a)(3) outside the territorial limit imposed on that power. *See, e.g., United States v. Gonzalez*, 875 F.2d 875, 877–81 (D.C.Cir. 1989) (holding Customs officers may not board and search ships in international waters unless the ships are "hovering vessels," because statutory authority to board and search only extends to such vessels). Thus, the defendants' conclusion that "whereas the Coast Guard could have performed the same enforcement activity, the INS could not" is erroneous because it assumes the incorrect premise that the Attorney General cannot delegate her broad enforcement powers to the INS.

### III

Because we reverse on the basis that the district court erroneously held that the INS agents exceeded their legal authority in conducting this extraterritorial undercover operation, we need not consider whether the district court abused its discretion in dismissing the indictment pursuant to its supervisory powers. We reverse and remand with instructions to reinstate the single count indictment against all nine defendants.

**REVERSED AND REMANDED.**